UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Case No. _____

TFG LIFE SETTLEMENTS, LLC,
a Delaware limited liability company,

    Plaintiff,

vs.

CENTURION INSURANCE SERVICES
GROUP, LLC, an Ohio limited liability
company, and CENTURION ISG (EUROPE)
LIMITED, an Irish corporation,

    Defendants.

_____/

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

    Pursuant to Federal Rule Civ. P. 65, Plaintiff TFG Life Settlements, LLC ("TFG"), respectfully moves this Court for a Temporary Restraining Order ("TRO") and a Preliminary Injunction, and in support thereof, states:

    1.    TFG seeks entry of a TRO, after an emergency hearing on this Motion, restraining Defendants Centurion Insurance Services Group, LLC and Centurion ISG (Europe) Limited (collectively, "Centurion") and their agents, brokers, intermediaries, servants, employees, representatives, contractors, principles, members, shareholders, affiliates and anyone acting on their behalf, at their direction, or in concert therewith, including but not limited to the Bank of Utah, from (a) offering for sale, selling, transferring, gifting, or conveying the Winemiller Policies to any person other than TFG; (b) permitting the Winemiller Policies to be subject to any encumbrances or liens of any kind; and (c) allowing the Winemiller Policies to lapse, enter into a grace period or otherwise be adversely affected, until further order of this Court.

    2.    In addition, TFG is seeking a preliminary injunction. After an opportunity for the Court to consider a more comprehensive evidentiary record, TFG asks the Court to extend the injunctive relief requested above following the emergency hearing for a TRO until a final judgment is entered in this matter.

3. TFG has filed a Verified Complaint in this action, and the facts alleged in the Verified Complaint, in addition to the Declarations of Gary Brecka and James Maxson, clearly show that immediate and irreparable injury, loss, and/or damage will result to TFG before a noticed motion for preliminary injunction can be heard. In fact, the parties specifically agreed as part of their agreement that "irreparable harm would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms on a timely basis or were otherwise breached." As a result, the parties further agreed that "without posting bond or other undertaking, the Parties shall be entitled to injunctive or equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court of competent jurisdiction . . . ." Accordingly, TFG seeks entry of the TRO. TFG provided Centurion with copies of its request for TRO on December 3, 2015 through the service of Centurion's agent for service of process. Because of the immediate and irreparable harm that TFG has suffered and is suffering, no further notice should be required.

4. TFG incorporates herein its Memorandum of Law.

WHEREFORE, TFG requests that the Court: (a) Court grant its Motion for TRO pursuant to Rule 65; (b) schedule a hearing for preliminary injunction within fourteen (14) days of issuing the TRO; (c) grant TFG's Motion for Preliminary Injunction; and (d) grant any other relief that the Court deems necessary and proper.

## MEMORANDUM OF LAW

### I.   INTRODUCTION

This is a classic case of seller's remorse. Less than two days after executing binding and enforceable agreements for the sale of three life insurance policies to TFG, Centurion informed TFG that it was breaching the parties' agreement in order to sell the policies to another buyer for a higher price. The parties, however, already anticipated that such an event would occur and specifically agreed in writing that any attempt to breach the parties' agreements by Centurion would result in irreparable harm to TFG for which no adequate remedy at law exists. As a result, the parties expressly agreed that TFG would be entitled to the very relief it now seeks – an injunction without bond to prevent the transfer of the policies to someone other than TFG and to prevent any wasting of the policies during the pendency of this action.

In opposition to this motion, Centurion is likely to claim that the parties did not have a binding agreement for the purchase of any policies. This contention is belied by the fact that the parties exchanged executed copies of the three agreements within days of each other and that the sole basis for Centurion's argument is its fabricated issue regarding only the Aviva Policy. In reality, Centurion found another buyer willing to pay more for the policies and it is now looking for any excuse to avoid honoring its agreements with TFG. The agreements, however, do not afford Centurion with the right to terminate as it desires. In fact, they expressly mandate specific performance and injunctive relief to ensure the consummation of the parties' agreements. TFG simply asks the Court for the very relief that the parties expressly agreed to when they negotiated and executed the purchase agreements at issue.

Without a Temporary Restraining Order and subsequently a Preliminary Injunction, TFG will suffer irreparable damage. First, Centurion has already allowed two of the three policies to enter into a grace period for non-payment. One faces an impending deadline of December 4, 2015 to resolve. Absent the requested TRO, there is a genuine risk that one, and possibly all three policies, would lapse for which Centurion has admitted there is no adequate remedy for TFG. Second, Centurion has already admitted to TFG that it has entered into an agreement with another buyer for each of the three policies, which could result in the sale of the policies to innocent third party purchaser before TFG's motion for preliminary injunction could be heard. Thus, TFG respectfully asks this Court to issue emergency injunctive relief requested in the

3

motion. TFG will seek to extend that emergency relief for the pendency of this action at a Preliminary Injunction hearing as also specified in this motion.

## II.    FACTUAL BACKGROUND

### A.    The Parties

TFG is a private equity fund engaged in the life settlements industry. *See* Ver. Comp. ¶ 9; Declaration of Gary Brecka ("Brecka Decl.") at ¶ 2. A life settlement is the purchase and sale of a life insurance policy to a third party for a value in excess of the policy's cash surrender value, but less than its face value. *See id.* As part of a typical life settlements transaction, a policy owner receives a cash payment in exchange for transferring ownership of the policy to the purchaser. *See id.* Like TFG, Centurion is in the life settlements industry. *See* Ver. Comp. ¶ 10.

### B.    The Policies at Issue

This case involves TFG's purchase of three life insurance policies from Centurion (collectively, the "Winemiller Policies"):

   a. an insurance policy issued by John Hancock Life Insurance Company, Policy No. 95475091, insuring the life of Jimmy D. Winemiller with a death benefit of $10 million (the "John Hancock Policy");

   b. an insurance policy issued by Aviva Life and Annuity Company (USA), Policy No. IL02139410, insuring the life of Jimmy D. Winemiller with a death benefit of $10 million (the "Aviva Policy"); and

   c. an insurance policy issued by Zurich American Life Insurance Company, Policy No. 151301, insuring the life of Jimmy D. Winemiller with a death benefit of $5 million (the "Zurich Policy").

*See* Ver. Comp. ¶ 22; Brecka Decl. at ¶ 7; Declaration of James Maxson ("Maxson Decl.") at ¶ 10. Upon information and belief, Centurion ISG (Europe) Limited is the beneficial owner of the Winemiller Policies. *See* Ver. Comp. ¶ 10.

### C.    TFG's Purchase of the Winemiller Policies

On or about November 22, 2015, TFG was approached by two brokers with whom it sources policies about the possibility of purchasing the Winemiller Policies. *See* Ver. Comp. ¶¶ 11-13; Brecka Decl. at ¶¶ 4-6. In response, TFG made an offer through these brokers to Centurion. *See* Ver. Comp. ¶ 13; Brecka Decl. at ¶ 7. Specifically, TFG offered to pay

4

$1,025,000 for the John Hancock Policy; $700,000 for the Aviva Policy; and $75,000 for the Zurich Policy for a total purchase price of $1.8 million. *See id.* Centurion accepted this offer. *See* Ver. Comp. ¶ 13; Brecka Decl. at ¶ 8. As a result, the parties, through their respective counsel, negotiated and drafted a written agreement setting forth the specific terms of their agreement with respect to each of the three policies. *See* Ver. Comp. ¶¶ 13-14; Brecka Decl. at ¶¶ 8-9; Maxson Decl at ¶¶ 2-4.

Final versions of the parties' agreements were circulated on November 30, 2015. *See* Maxson Decl. at ¶ 4. Later that same day, Centurion sent TFG its executed copies of the purchase and sale agreements for each of the three policies. *See id.* at ¶¶ 5-7, Exhs. A-C. TFG provided Centurion with its counter-signed copies of the executed agreements for each of the three policies the next day, December 1, 2015. *See id.* at ¶ 8, Exh. D. On December 1, 2015, the Bank of Utah also confirmed that TFG had performed its obligations under the parties' agreements by depositing with the Bank of Utah the total purchase price for all three policies. *See* Brecka Decl. at ¶ 11, Exh. A.

### D. <u>The Parties Contractually Agreed to TFG's Requested Relief Because of the Irreparable Harm TFG Would Suffer if Centurion Breached the Agreements</u>

Like real estate, life insurance policies are unique assets. *See* Ver. Comp. ¶ 2. Depending on the goals and intent of each investor, quantifying value of a policy is difficult, if not impossible, to do. *See id.* Recognizing this fact, the parties expressly agreed that "irreparable harm would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms on a timely basis or were otherwise breached." Maxson Decl. at ¶¶ 5-7, Exhs. A at § XXIV, B at § XXIV, C at § XXV. As a result, the parties agreed that "without posting bond or other undertaking, the Parties shall be entitled to injunctive or equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court of competent jurisdiction . . . ." *Id.* Indeed, the parties specifically bargained for specific performance as an available remedy in the event of a party's actual or threatened breach. *Id.*

### E. <u>Centurion's Breach of the Agreements</u>

Less than 48 hours after signing the agreements, and less than 24 hours after receiving TFG's signatures, Centurion informed TFG that it would not authorize the Bank of Utah to

finalize the closing as it previously agreed. *See* Ver. Comp. ¶ 19; Brecka Decl. at ¶¶ 14-15, Exh. D. Centurion was unequivocal in its statement that it would not honor its agreements with TFG. *See id.* TFG has since learned that the reason for this is that Centurion stands to gain more than $1 million if it pursues the sale of the Winemiller Policies to other buyers. *See* Ver. Comp. ¶ 20; Brecka Decl. at ¶ 16.

### F. <u>Irreparable Harm Is Imminent Without Requested Relief</u>

Not only has Centurion contractually acknowledged the irreparable harm that its breach of the parties' agreements will cause, and that the relief requested by TFG is proper and appropriate, but the irreparable harm that will be caused by Centurion's actions is imminent without a TRO. At least one of the policies (the Aviva Policy) is currently in grace period meaning that it will lapse (i.e. the policy will terminate) if a payment in the amount of $255,008.66 is not made before the end of the grace period. *See* Brecka Decl. at ¶ 18. The grace period is currently set to end for the Aviva Policy on December 4, 2015. *See id.*; Ver. Comp. ¶ 14, Exh. A.

TFG has also just discovered that the John Hancock Policy has also entered into a grace period as a result of Centurion's failure to pay premiums timely. *See* Brecka Decl. at ¶ 19. While TFG is unaware of the amount needed to take the John Hancock Policy out of grace or the date it entered the grace period, that policy will likely lapse thirty (30) days from the day it entered the grace period without the requisite payment. *See id.*

Moreover, even if Centurion's takes the necessary steps to take the Winemiller Policies out of grace and to maintain them during the pendency of this action, Centurion has admitted to TFG that it intends to sell the policies to another buyer(s). *See id.* at ¶ 15.

### III. LEGAL ARGUMENT

Federal Rules of Civil Procedure 65 provides for the issuance of temporary restraining orders and preliminary injunctions. Injunctive relief may be granted provided the movant establishes: "(1) a substantial likelihood of success on the merits; (2) an immediate and irreparable injury absent injunctive relief; (3) a threatened harm to the plaintiff that outweighs any injury the injunction would cause to the nonmovant and (4) the injunction will not disserve the public interest." *K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1272 (S.D. Fla. 2011).

For brevity, TFG combines the application of these venerable four factors for both the emergency injunctive relief sought in the TRO and the preliminary injunction being sought at a subsequent preliminary injunctive proceeding. Because the four factors weigh in favor of TFG's request, TFG's Motion for TRO should be granted on an emergency basis and TFG's request for a Preliminary Injunction should be granted after an evidentiary hearing.

### A. TFG is Likely to Succeed on the Merits of its Claims

The evidence submitted with this motion shows that the parties entered into three separate agreements, one for the purchase of each policy, that Centurion has purposefully breached each the parties' three agreements, that Centurion admitted that its breach of each agreement will cause irreparable injury to TFG and that the injunctive relief requested by TFG is an appropriate remedy, and that the irreparable injury is imminent in the absence of the Court's issuance of the requested relief.

#### 1. No Dispute that Centurion Breached the Agreements Related to the John Hancock and Zurich Policies

On or about November 23, 2015, TFG offered to purchase the John Hancock Policy for $1,025,000 and the Zurich Policy for $75,000. *See* Brecka Decl. at ¶ 7. Centurion accepted TFG offers for both of these policies that same day. Thus, as of November 23, 2015, the parties had a binding and enforceable oral agreement for TFG's purchase of the John Hancock and Zurich Policies. *See Ferguson v. Carnes*, 125 So.3d 841, 842 (Fla Ct. App, 4th Dist. 2013).

Over the course of the following week, the parties negotiated additional terms to their oral agreements for these two policies. All of these additional terms were agreed to orally by both parties on November 30, 2015 and were memorialized in the final written draft of the agreements circulated between the parties that same day. *See* Maxson Decl. at ¶¶ 3-8, Exhs. A-D.

Later that day, TFG and Centurion entered into a written agreement for the purchase and sale of the John Hancock and Zurich Policies. Specifically, on November 30, 2015, Centurion sent TFG its signature pages for both policies. *See id.* at ¶¶ 5-7, Exhs. A-C. The following day, TFG sent Centurion its signature pages for the purchase agreement for each of these two policies. *See id.* at ¶ 7, Exh. D. The written agreements expressly superseded the parties' prior oral agreements. *See id.* at ¶¶ 5-6, Exh. A at § XV; Exh. B at § XV. By executing the two written

7

agreements for the John Hancock and Zurich Policies, Centurion represented and warranted that "th[e] Agreement[s] ha[ve] been duly authorized, executed and delivered by it and constitute[] legal, valid and binding obligation[s] of Seller, enforceable against it in accordance with its terms . . . ." Maxson Decl. at ¶¶ 5-6, Exh. A at § IV(6); Exh. B at § IV(6). Centurion further represented that "the[ese] Agreement[s] [are] irrevocably binding upon the Parties and their successors and assigns." Id., Exh. A at § VII; Exh. B at § VII.

Not only did the parties enter into either binding oral or written agreements for the purchase and sale of the John Hancock and Zurich Policies, but the undisputed evidence is that TFG fully performed its obligations under the parties' agreements by depositing funds for the purchase of both policies with the Bank of Utah. See Brecka Decl. at ¶ 11, Exh. A. Tthe Bank of Utah confirmed TFG's performance on December 1, 2015. See id.

Nor can there be any dispute that Centurion breached the parties' agreements. Centurion's principles, Brian Schwartz and Marshal Seeman, unequivocally informed Mr. Brecka of TFG that Centurion would not authorize Bank of Utah to finalize the sale of those policies to TFG. See id. at ¶ 15. Centurion further breached the parties' agreements when it agreed to sale those two policies to another buyer. See id. at ¶ 16.

Lastly, Centurion's breach was not excused. TFG fully performed its obligations, no dispute existed regarding any terms of the parties' agreement for the John Hancock and Zurich Policies, and no facts existed that would allow Centurion to terminate the agreements.[1]

Thus, given the above facts, there is a substantial likelihood that TFG will prevail on the merits of its claims for breach of contract regarding the John Hancock and Zurich Policies.

### 2. TFG will also Prevail on the Merits of its Claims Related to the Aviva Policy

The entirety of the dispute between TFG and Centurion revolves around whether the parties finalized the terms of their agreement for the purchase of the Aviva Policy. Like the other two policies, there is a substantial likelihood that TFG will prevail on the merits of its claims that the parties entered into a valid oral or written agreement for the purchase of the

---

[1] The parties' agreements provided for a single ground for Centurion to terminate – if TFG breached the parties' agreement and failed to cure within ten days of receiving written notice from Centurion of such breach. See Maxson Decl. at ¶¶ 5-6, Exh. A at §XIII; Exh. B. at § XIII. There is no dispute that these grounds do not exist here. See Brecka Decl. at ¶ 17.

Aviva Policy, that TFG fully performed its obligations related to that policy, that Centurion breached the parties' agreement by refusing to proceed with the sale of that policy, and that its breach was not excused.

TFG and Centurion entered into a binding oral agreement for the sale of the Aviva Policy (1) on November 23, 2015 when Centurion accepted TFG's offer to purchase that policy, and (2) on November 30, 2015, when Centurion confirmed that the parties had reached an agreement on additional terms related to the Aviva Policy, including the handling of the $255,008.66 payment claimed by the carrier to take the policy out of grace. *See* Ver. Comp. ¶¶ 13-14; Brecka Decl. at ¶¶ 7-9; Maxson Decl. at ¶¶ 2-8, Exhs. A-D.

Centurion's anticipated defense that the parties did not have a binding written agreement with respect to the Aviva Policy is unavailing for several reasons. First, the argument ignores the fact that the parties orally agreed to all of the terms for the sale of the Aviva Policy. *See id.* Second, Centurion's argument is belied by the fact that the parties exchanged executed written agreements with each other prior to Centurion's attempt to repudiate the parties' agreement. *See* Maxson Decl. at ¶¶ 4-8, Exhs. A-D.

The entire crux of Centurion's argument is its reliance on an email from TFG's administrator, Gary Brecka, after Centurion delivered executed copies of the agreement for the Aviva Policy, stating that TFG would move forward with closing the Aviva Policy on one small condition – that Centurion agree to allow the Bank of Utah to pay Aviva the amount necessary to take the policy out of grace at the time of closing. *See* Brecka Decl. at ¶ 12, Exh. B. This condition, however, was not a new term, but mirrored the terms already agreed to by the parties and memorialized in their written agreement. *See* Maxson Decl. at ¶ 7, Exh. C at § IV (providing that the $255,008.66 premium payment to the carrier shall either be paid by Centurion before closing or it will be paid by TFG and the purchase price reduced accordingly). Thus, Mr. Brecka's email explaining what constituted the payment alleged by the carrier and confirming a term already agreed to by the parties did not constitute a new term or counter offer.

Regardless, even if Mr. Brecka's email constituted a newly proposed term, Centurion did not repudiate the parties' agreement for the purchase of the Aviva Policy in response. Rather, Centurion merely rejected the proposed term. *See* Brecka Decl. at ¶ 14, Exh. D. Hours later, TFG then counter-signed the written agreement executed by Centurion. *See* Maxson Decl. at ¶ 8,

Exh. D. Centurion did not attempt to repudiate the parties' agreement for the purchase of the Aviva Policy until the following day, however, by that time the agreement had been fully executed and became duly valid by its very terms: "this Agreement has been duly authorized, executed and delivered by it and constitutes legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms . . . ." Maxson Decl. at ¶ 7, Exh. C at § V(6); *see also id.* at Exh. C. § VIII ("[T]he] Agreement is irrevocably binding upon the Parties and their successors and assigns.").

Not only did the parties enter into binding oral or written agreements for the purchase and sale of the John Hancock and Zurich Policies, but the undisputed evidence is that TFG fully performed its obligations under the parties' agreements by depositing funds for the purchase of the Aviva Policy with the Bank of Utah. *See* Brecka Decl. at ¶ 11, Exh. A.

Nor can there be any dispute that Centurion breached the parties' agreement regarding the purchase of the Aviva Policy. Centurion's principles, Brian Schwartz and Marshal Seeman, unequivocally informed Mr. Brecka at TFG that Centurion would not authorize Bank of Utah to finalize the sale of the Aviva Policy to TFG and, separately, when Centurion agreed to sale that policy to another buyer. *See id.* at ¶¶ 15-16.

Lastly, Centurion's breach was not excused. TFG fully performed its obligations and no facts existed that would allow Centurion to terminate the agreements.[2]

Thus, given the above facts, there is a substantial likelihood that TFG will prevail on the merits of its claims for breach of contract regarding the Aviva Policy.

### 3. Centurion Admitted that Its Breach Would Cause TFG Irreparable Harm

Life insurance policies are unique assets. *See* Ver. Comp. ¶ 2. Recognizing this fact, the Centurion admitted that "irreparable harm would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms on a timely basis or were otherwise breached." Maxson Decl. at ¶¶ 5-7, Exh. A at § XXIV; Exh. B at § XXIV; Exh. C at § XXV. As a result, Centurion agreed that "without posting bond or other undertaking, [TFG]

---

[2] The parties' agreements provided for a single ground for Centurion to terminate – if TFG breached the parties' agreement and failed to cure such breach within ten days of receiving written notice from Centurion of such breach. *See* Maxson Decl. at ¶ 7. Exh. C at §IX. There is no dispute that these grounds do not exist here. *See* Brecka Decl. at ¶ 17.

shall be entitled to injunctive or equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court of competent jurisdiction . . . ." *Id.* Indeed, the parties specifically bargained for specific performance as an available remedy in the event of a party's actual or threatened breach. *Id.*

Not only has Centurion contractually acknowledged the irreparable harm that its breach of the parties' agreements will cause, and that the relief requested by TFG is proper and appropriate, but the irreparable harm that will be caused by Centurion's actions is imminent without a TRO. At least one of the policies (the Aviva Policy) is currently in grace period meaning that it will lapse (i.e. the policy will terminate) if a payment in the amount of $255,008.66 is not made before the end of the grace period. The grace period is currently set to end for the Aviva Policy on December 4, 2015. *See* Ver. Comp. ¶ 14, Exh. A; Brecka Decl. at ¶ 18.

TFG has also just discovered that the John Hancock Policy has also entered into a grace period as a result of Centurion's failure to pay premiums timely. *See* Brecka Decl. at ¶ 19. While TFG is unaware of the amount needed to take the John Hancock Policy out of grace or the date it entered the grace period, that policy will likely lapse thirty (30) days from the day it entered the grace period without the requisite payment. *See id.*

Moreover, even if Centurion's takes the necessary steps to take the Winemiller Policies out of grace and to maintain them during the pendency of this action, Centurion has admitted to TFG that it intends to sell the policies to one or more other buyers. *See id.* at ¶¶ 15-16. Thus, absent both a TRO and preliminary injunction, Centurion will dispose of the policies despite its contractual obligations to not do so.

### 4. Harm to TFG Outweighs any Injury to Centurion

Centurion contractual agreement that its breach of the parties' agreements justified the imposition of injunctive relief without bond constitutes an admission that the harm to TFG outweighs any claimed injury to Centurion. *See* Maxson Decl. at ¶¶ 5-7, Exh. A at § XXIV; Exh. B at § XXIV; Exh. C at § XXV. The simple fact is that Centurion entered into binding and enforceable agreements, both oral and written, for the sale of the Winemiller Policies to TFG. Centurion had no legal justification or excuse for subsequently refusing to honor its obligations. While Centurion may lose out on the sale of the policies at a higher amount, that is the risk it

11

accepted when it agreed to sell the policies to TFG for a total purchase price of $1.8 million. As such, Centurion has not, nor can it claim, that the irreparable harm that TFG will admitted suffer as a result of Centurion's breach is outweighed by any claim harm to Centurion.

### 5. The TRO and Preliminary Injunction Will Not Disserve the Public Interest

The TRO and Preliminary Injunction requested by TFG mirrors the express intent of the parties. The public interest will be served by ensuring that the intent of contracting parties is followed, that the tangible assets at issue are preserved, and that innocent third parties do not get duped into an agreement for which Centurion cannot honor. As such, the relief requested by TFG will not disserve the public interest.

## IV. CONCLUSION

All four factors used by this Court in determining whether an emergency injunction favor the issuance of the injunctive relief requested by TFG in order to maintain the status quo pending the final disposition of this action. Respectfully, TFG asks this grant its Motion for TRO pursuant to Rule 65 and that the Court schedule a hearing and subsequently grant TFG's Motion for Preliminary Injunction.

Dated this 3rd day of December, 2015.

Respectfully submitted,

RING BENDER MCKOWN & CASTILLO, LLLP
One Alhambra Plaza
Suite 620
Coral Gables, FL 33134
Telephone: (786) 235-2030
Facsimile: (786) 703-1481
E-Mail: ccastillo@ringbenderlaw.com
       amckown@ringbenderlaw.com
       lgonzalez@ringbenderlaw.com

By: /s/ Carlos B. Castillo
    Carlos B. Castillo
    Florida Bar No. 907741