UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Case No. _____

TFG LIFE SETTLEMENTS, LLC,
a Delaware limited liability company,

    Plaintiff,

vs.

CENTURION INSURANCE SERVICES
GROUP, LLC, an Ohio limited liability
company, and CENTURION ISG (EUROPE)
LIMITED, an Irish corporation,

    Defendants.

_____/

## DECLARATION OF GARY BRECKA

Pursuant to 28 U.S.C. § 1746, Gary Brecka declares as follows:

1. My name is Gary Brecka. I am over 18 years of age, and I am capable of making this affidavit. I have personal knowledge of the facts stated in this affidavit and attest that they are true and correct.

2. Plaintiff TFG Life Settlements, LLC ("TFG") is a private equity fund engaged in the life settlements industry. A life settlement is the purchase and sale of a life insurance policy to a third party for a value in excess of the policy's cash surrender value, but less than its face value. As part of a typical life settlements transaction, a policy owner receives a cash payment in exchange for transferring ownership of the policy to the purchaser.

3. I am Administrator for TFG, a position I have held since TFG's inception. As Administrator, I am responsible for the day-to-day management and operation of TFG's business, including all negotiations related to the purchase or sale of any life settlement considered by TFG. In that role, I was intimately involved in the negotiations and agreements reached between TFG and Centurion Insurance Services Group, LLC as agent for Centurion ISG (Europe) Limited (collectively, "Centurion") related to the purchase of three insurance policies

insuring the life of Jimmy D. Winemiller with a total death benefit of $25 million (the "Winemiller Policies").

4. As a buyer and seller of life settlements, TFG has developed relationships with various companies who present it with policies for purchase and who assist TFG in marketing its policies in the secondary and tertiary markets, including Alex Barba of Life Force Financial and Justin Eriksen of One Degree Strategies, LLC.

5. On or about November 22, 2015, I was approached by Mr. Barba and Mr. Eriksen regarding the possibility of purchasing the Winemiller Policies from Centurion.

6. Mr. Barba and Mr. Eriksen explained that Centurion was having financial issues and that it was no longer in a financial position to maintain the Winemiller Policies through the payment of premiums beyond December 31, 2015.

7. As a result, I authorized Mr. Barba and Mr. Eriksen to make offers on each of the Winemiller Policies as follows:

   a. the insurance policy issued by John Hancock Life Insurance Company, Policy No. 95475091, insuring the life of Jimmy D. Winemiller with a death benefit of $10 million (the "John Hancock Policy") for $1,025,000;

   b. the insurance policy issued by Aviva Life and Annuity Company (USA), Policy No. IL02139410, insuring the life of Jimmy D. Winemiller with a death benefit of $10 million (the "Aviva Policy") for $700,000; and

   c. the Zurich American Life Insurance Company, Policy No. 151301, insuring the life of Jimmy D. Winemiller with a death benefit of $5 million (the "Zurch Policy") for $75,000.

8. On or about November 23, 2015, I received confirmation that Centurion had accepted our offers on each of the Winemiller Policies. Thereafter, counsel for the parties began drafting and negotiating the purchase agreements.

9. During the course of the parties' negotiations, I discovered that the policy issued by Aviva Life and Annuity Company (USA) had entered into a grace period, meaning that Centurion had not timely paid the premiums owed on the policy. The insurance carried claimed that a payment of $255,008.66 was needed to take the Aviva Policy out of grace. As a result, the parties revised the purchase agreement for the Aviva Policy so that Centurion either paid the premium on or before December 3, 2015, or a portion of the purchase price would be held in

reserve to pay the premium after closing. Either way, the total purchase price for the three polices remained the same.

10. On November 30, 2015, TFG received Centurion's executed copies of the purchase and sale agreement for each of the three Winemiller Policies.

11. On December 1, 2015, I asked the parties' contact at Bank of Utah, Arge Feotis, to send confirmation to Centurion's principle, Brian Schwartz, that TFG had the agreed upon purchase price for each of the policies on deposit with Bank of Utah. Mr. Feotis sent a confirming email regarding its possession of the purchase price for each of the policies. I was one of the recipients of Mr. Feotis' email. A true and correct copy of this email correspondence is attached hereto as **Exhibit A**.

12. Also on December 1, 2015, I had a nearly two hour telephone conversation with various representatives at Aviva to determine its calculation of the $255,008.66 payment it claimed was owed in order to take the Aviva Policy out of grace. It was during this conversation when I obtained additional information regarding the breakdown of that payment. As a result, I sent Brian Schwartz, a principle at Centurion, an email explaining my belief that the amount of the payment claimed by Aviva appeared correct and sharing the detailed information provided to me by Aviva regarding the breakdown of the payment. A true and correct copy of my email is attached hereto as **Exhibit B**. While my email referenced that TFG would close on "one small condition," that "condition" was already an agreed upon term in the purchase agreement executed by Centurion for the Aviva Policy (see Section IV). As Mr. Schwartz himself acknowledged, the amount of the payment claimed by Aviva had no effect on the total purchase price being paid by TFG for the Winemiller Policies. A true and correct copy of Mr. Schwartz's admission is attached hereto as **Exhibit C**.

13. The fact that my email was not referencing a new condition as part of the parties' agreements is further evidenced by the fact that TFG provided counter-signatures to the purchase and sale agreements just hours later without proposing any changes to the language of those agreements.

14. Nonetheless, in response to my email, Mr. Schwartz informed me for the first time that "until we speak and come to agreement on this premium issue, Centurion is not trading any of these policies." A true and correct copy of this email chain is attached hereto as **Exhibit D**.

15. The following day I made multiple efforts to confirm with Mr. Schwartz that Centurion intended to close as required by the parties' agreements. At approximately 4:00 p.m. on December 2, 2015, I received a call from Mr. Schwartz informing me that Centurion would not be honoring the terms of the parties' agreements because Centurion had made other arrangements to sell the policies to another buyer. Shortly after this call, I then received a call from both Mr. Schwartz and Marshal Seeman, another principle at Centurion. During this call, Mr. Seeman emphatically stated that under no circumstance would Centurion sell any of the Winemiller Polices to TFG and that he welcomed any lawsuit that we wanted to file. After Mr. Seeman left the call, Mr. Schwartz then asked if we could meet for lunch the next day after he had a chance to discuss the issue with Mr. Seeman.

16. I have since learned that the reason why Centurion refused to close the transactions in breach of the parties' agreements is because it received higher offers on each of the Winemiller Policies that, in total, exceed TFG's offer by more than $1 million.

17. I am the person designated in the agreements for the purpose of any notice that is to be provided to TFG thereunder. At not time did I ever receive notice from Centurion that TFG was in breach of any of the three agreements for any reason.

18. As the parties agreed, time is of the essence. This is particularly true with respect to the Aviva Policy, which is already in a grace period and is at risk of lapsing (i.e. the policy will be terminated) if Centurion is not ordered to either complete the sale or maintain the policies pending the outcome of this case. The grace period for the Aviva Policy is currently set to expire on December 4, 2015.

19. I also just discovered that the John Hancock Policy has also entered into a grace period as a result of Centurion's failure to pay premiums timely. While I am not aware of the amount needed to take the John Hancock Policy out of grace or the date it entered the grace period, that policy will lapse thirty (30) days from the day it entered the grace period without the requisite payment.

20. Indeed, unless this sale is consummated or Centurion is ordered to maintain all of the Winemiller Policies pending a final resolution in this case, all of the policies will lapse. As the parties' agreed, monetary damages would not be sufficient to compensate TFG for Centurion's breach of the parties' agreements.

Executed on this 2nd day of December, 2015.

4

_____
GARY BRECKA