**EXHIBIT C**

**Aaron McKown**

| | |
|---|---|
| **Subject:** | TFG |
| **Attachments:** | TFG Form of PSA - Winemiller Policy IL02139410 - Aviva (00084742) Centurion cmnts.docx; 13702-Grace Notice-2015.11.23.pdf |

**From:** Alan Hodge [mailto:AHodge@Centurion-life.com]
**Sent:** Monday, November 30, 2015 5:16 PM
**To:** Jim Maxson <jmaxson@culhanemeadows.com>
**Subject:** TFG

Jim

Please see attached.  I have added a new Section IV on page 5 which deals with the grace payment.

We believe that the actual amount to be paid is less than quoted by the carrier.  However, this will not affect the gross amount payable by your client.

I am preparing executed copies of the agreed PSAs on the Zurich and John Hancock policies.

Please confirm that the attached is acceptable and I will send you an excited final version of the Aviva PSA.

Best regards


T. Alan Hodge Esq.,
CENTURION INSURANCE SERVICES GROUP, LLC
Direct: (203) 293 7010
Cell:    (203) 293 5424
Fax:     (203) 916 6899
Email:  Ahodge@centurion-life.com

(Member of the State Bar of California; Solicitor of the Superior Courts of England and Wales; Licensed Legal Consultant (New York))

CONFIDENTIALITY NOTICE:

This e-mail, including its contents and attachments, if any, are confidential and for the named recipient's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any erroneous transmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You may not directly or indirectly, use, disseminate, distribute, or forward this e-mail message or disclose its contents to anybody else. Copyright and any other intellectual property rights in its contents are the sole property of Centurion Insurance Services Group LLC or its affiliates, as applicable.

E-mail transmission cannot be guaranteed to be secure or error-free. The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a result of e-mail transmission.  If verification is required please request a hard-copy version.

Addressees should check this e-mail and any attachments for viruses. We make no representation or warranty as to the absence of viruses in this e-mail or any attachments. Please note that to ensure regulatory compliance and for the protection of our customers and business, we may monitor and read e-mails sent to and from our server(s). Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them in a representative capacity.

Accordia Life and Annuity Company
PO Box 305027, Nashville, TN 37230-5027
Phone 877-462-8992 Fax 800-351-0603

September 28, 2015

BANK OF UTAH AS SECURITIES INTERMEDIARY
200 E SOUTH TEMPLE STE 210
SALT LAKE CITY UT 84111

Policy Owner:    BANK OF UTAH AS SECURITIES INTERMEDIARY
Insured :        JIMMY WINEMILLER
Policy Number:   IL02139410

Minimum Amount Due:  $255,008.66

Subject: Urgent Notice - Your Policy Coverage is at Risk

Dear BANK OF UTAH AS SECURITIES INTERMEDIARY,

We want you to know the cash value in your life insurance policy was not enough to cover the cost of insurance deduction for September. As a result, your life insurance policy has entered the grace period. This means your policy coverage will end unless we receive the minimum payment.

To maintain your coverage, the minimum payment needed is $255,008.66 by 12:00 a.m. on December 4, 2015.

You have choices to preserve your coverage with us, so we strongly encourage you to speak with your licensed insurance professional or contact us at (877) 462-8992. For example, you may be able to make changes to your coverage or increase your current premium so your coverage is not at risk in the future.

We appreciate your business and are committed to providing you with accurate and caring service. If you have questions or need additional assistance, please contact your insurance professional or our Customer Contact Center.

Sincerely,
Customer Service

0000020925

200059.0114

## LIFE INSURANCE POLICY PURCHASE AND SALE AGREEMENT

This Life Insurance Policy Purchase and Sale Agreement ("Agreement") is made and entered into as of November 25, 2015 ( "Effective Date"), by and between Centurion Insurance Services Group, LLC, an Ohio limited liability company, not in its individual capacity but solely as agent for Centurion ISG (Europe) Limited an Irish corporation ("Seller"), through Bank of Utah as its securities intermediary("Securities Intermediary ("Seller"), which, in such capacity is the sole owner and sole beneficiary of record of the life insurance Policy identified below that is the subject of this Agreement, and TFG Life Settlements, LLC, a Delaware limited liability company through Bank of Utah as its Securities Intermediary ("Purchaser"). Each of the Seller and the Purchaser is referred to in this Agreement as a "Party" and collectively as the "Parties."

### RECITALS

A.    Whereas, Seller, through its securities intermediary,the Seller's Securities Intermediary (defined in Section I.), is the owner of all rights, titles and interests in the life insurance policy and the death benefits payable thereunder (the "Policy"):

|                          |                                              |
|--------------------------|----------------------------------------------|
| **Policy Number**:       | IL02139410                                   |
| **Life Insurance Company**: | Aviva Life and Annuity Company ("Insurer") |
| **Issue/Conversion Date**: | February 28, 2011                          |
| **Type of Policy**:      | Flexible Premium Adjustable Life             |
| **Face Amount**:         | $10,000,000                                   |
| **Current Death Benefit**: | $10,000,000                                 |
| **Insured**:             | Jimmy D. Winemiller ("Insured")              |
| **Insured's Social Security #**: | 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                          |

B.    Whereas, Purchaser is in the business of purchasing in-force, non-variable life insurance policies such as the Policy.

C.    Whereas, Seller, through its securities intermediary, owns the Policy and desires to sell to Purchaser, and Purchaser, through its securities intermediary, desires to purchase from Seller, all rights, titles and interests in and to the Policy and all the death benefits payable thereunder in accordance with the terms and conditions of this Agreement and the Purchase Agreement.

### AGREEMENT

Now, therefore, for and in consideration of the premises and of the mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency and adequacy of which are hereby acknowledged, the Parties, each intending to be legally bound, hereby agree as follows, with the above Recitals incorporated herein by this reference:

I.    Definitions. As used in this Agreement, the following terms have their respective meanings set forth below:

A.    "Affiliate" means, with respect to any Person, any other Person controlling or controlled by or under common control with such specified Person. For purposes of this

definition. "control." when used with respect to a specific Person. means the power to direct the management and Policy of such Person. directly or indirectly. whether through the ownership of voting securities. by contract or otherwise: and the term "controlling" and "controlled" have meanings correlative to the foregoing.

B.      "Agreement" has the meaning given to such term in the introductory paragraph hereof.

C.      "Applicable Law" means. with respect to any Person. any domestic or foreign federal. state or local statute. law. ordinance. code or common law or any rules. regulations. administrative interpretations. or orders issued by any Governmental Authority pursuant to any of the foregoing. and any order. writ. injunction. directive. administrative interpretation. judgment or decree applicable to such Person or such Person's business. properties. assets. officers. directors. employees or agents. including without limitation. any State Settlement Law.

D.      "Business Day" means any day other than a Saturday. Sunday or day on which commercial banking institutions in New York. New York. Salt Lake City or Naples. Florida are authorized or obligated by Applicable Law or executive order to be closed.

E.      "Closing Date" has the meaning set forth in Section IX XI herein.

F.      "Death Benefit" means. with respect to the Policy. the face amount of the death benefit of the Policy.

G.      "Due Inquiry" means exercising a reasonable standard of diligence and care appropriate under prevailing industry standards for a Person engaged in the purchase and sale of in-force life insurance Policy in life settlement or other life insurance secondary market transactions. which standard of diligence and care shall (i) include a review of such information and documentation as is reasonably necessary to enable such Person to be informed of the facts and circumstances pertaining to any representations and warranties of such Person contained herein and to make. in good faith. a determination which such Person is obligated to make under this Agreement (including the representations. warranties and covenants herein) and (ii) in no event be less than the standard employed by the Seller in acquiring the Policy for its own account or for the account of any Person other than the Purchaser.

H.      "Governmental Authority" means any nation or government. any state. province. city. municipal entity or other political subdivision thereof. and any governmental. executive. legislative. judicial. administrative or regulatory agency. department. authority. instrumentality. commission. board. bureau or similar body. whether federal. state. provincial. territorial. local or foreign.

I.      "Insured" means. with respect to the Policy. the natural person whose life is insured by the Policy.

J.      "Insurer" means. with respect to the Policy. the insurance company that has issued or is otherwise obligated to pay the related net Death Benefit upon the death of the

2

related Insured or any other benefit provided by the terms of such Policy (or the successor to such obligation).

K.    "Knowledge" means, with respect to a Person, after Due Inquiry, any actual awareness or knowledge of any officer of the Seller or those of its employees who, by position or job responsibility is aware of the fact or circumstances involved in the origination of, premium finance loans related to, or the resale of, the Policy.

L.    "Lien" means any interest in property securing an obligation owed to, or a claim by, a Person, whether such interest is based on the common law, statute or contract, in the nature of a security interest, lien, mortgage, encumbrance, pledge, conditional sale or trust receipt for a lease, consignment or bailment for security purposes.

M.    "Original Owner" means, with respect to the Policy, the Person that purchased such Policy from the applicable Insurer, and was the original owner thereof, that sold such Policy in a life settlement transaction or transferred (voluntarily or involuntarily) such Policy in relation to the maturity of a premium finance loan.

N.    "Party" or "Parties" has the meaning assigned to such term in the introductory paragraph hereof.

O.    "Person" means any individual, partnership, limited liability company, joint venture, firm, corporation, association, joint stock company, trust, trust company, trustee, estate, unincorporated organization, Governmental Authority or other entity.

P.    "Policy" has the meaning assigned to such term in the recitals of this Agreement.

Q.    "Policy File" means, with respect to a Policy, collectively (i) the original of such Policy or a certified copy thereof; (ii) all the related Settlement Documents for such Policy; (iii) the applicable Insurer's illustration for such Policy showing level pay Premiums with minimum cash surrender value at maturity dated no earlier than thirty (30) days prior to the Effective Date; (iv) evidence of ownership of such Policy by the Seller's Securities Intermediary; (v) all life expectancy reports related to the Insured under such Policy obtained by or provided to the Seller or any of its Affiliates within the 12 months preceding the Effective Date, regardless of the date thereof; and (vi) all written records in the possession or control of the Seller with respect to the location of the Insured under such Policy and each other Person designated by such Insured for the purpose of tracking the health status of such Insured and facilitating the obtainment of a death certificate of such Insured.

R.    "Purchaser" has the meaning given to such term in the introductory paragraph hereof.

S.    "Purchaser's Securities Intermediary" means Bank of Utah, a Utah banking corporation.

T.    "Securities Intermediary" means Bank of Utah, a Utah banking corporation.

"Seller" has the meaning given to such term in the introductory paragraph hereof.

"Seller's Securities Intermediary" means Bank of Utah, a Utah banking corporation.

"Settlement Documents" means, with respect to a Policy, each of the following that is in the possession or control of the relevant Seller, its Affiliates or its agents: (i) the Underlying Settlement Agreement relating to such Policy; and (ii) each other agreement, instrument or other document (A) constituting a "closing document," "transaction document" or other similarly designated document under the Underlying Settlement Agreement relating to such Policy, including written authorizations from the Insureds enabling the Seller and its assignees to obtain (i) protected health information about the Insureds from their respective health care providers in compliance with the Health Insurance Portability and Accountability Act of 1996 and the privacy regulations promulgated pursuant thereto and (ii) death certificates from any applicable Governmental Authority certifying the deaths of the Insureds or (B) otherwise executed and/or delivered by or on behalf of the relevant Original Owner, other seller or any beneficiary of, or the Insured under, such Policy or any spouse or other relative, physician or designated contact of any such Person pursuant to, or in connection with the transactions contemplated by, the Underlying Settlement Agreement relating to such Policy; and (iii) each purchase and sale agreement, all change of ownership and change of beneficiary forms (and confirmations of receipt and processing of the same by the related Insurer) and any entitlement orders relating to transfers of such Policy to the Seller through the Effective Date.

"State Settlement Law" means, with respect to the Policy, any statute, regulation or rule any state of the United States of America governing the sale of the ownership or any portion thereof, or all or any portion of the Death Benefit payable under, such Policy.

"Subsequent Owner" means, with respect to the Policy, the Person that purchased such Policy from the Original Owner and that sold such Policy in a life settlement transaction or transferred (voluntarily or involuntarily) such Policy in relation to the maturity of a premium finance loan.

"Underlying Settlement Agreement Documents" means, with respect to the Policy, the life settlement agreement or other purchase agreement between the Seller, on the one hand, and the related Original Owner or other seller of the Policy, as the case may be, in connection with the purchase by the Seller of such Policy in a life settlement or tertiary transaction and all other agreements, authorizations, notices, or instruments executed or delivered by any Person in connection therewith.

II.    Purchase and Sale of the Policy. Subject to the terms of this Agreement, as of the Closing Date for the Policy, Seller hereby irrevocably sells, transfers, conveys and assigns absolutely to Purchaser all rights, titles, interests, claims, cash values, dividends, options, riders, death and other benefits, and privileges of Seller in and under such Policy and all rights and remedies Seller received pursuant to the Settlement Documents. Seller agrees that after the Closing Date

for the Policy such Policy can be further sold, assigned or otherwise transferred by the Purchaser to any Person unknown to the Seller, without the Seller's consent or knowledge, and that Purchaser's rights hereunder may be assigned or otherwise transferred to any Person before, at or after the purchase of the Policy from the Seller by the Purchaser pursuant to this Agreement.

III.    Purchase Price. Purchaser shall pay to Seller and Seller agrees to accept as payment in full for the sale, transfer, conveyance and assignment of the Policy by the Seller to the Purchaser pursuant to this Agreement the gross amount of Seven Hundred Thousand Dollars ($700,000.00) (the "Purchase Price"). Seller agrees not to obtain any policy loans or create any liens and/or encumbrances against the Policy or to remove any cash value from the Policy after the Effective Date. Seller acknowledges and agrees that the Purchase Price is fair and reasonable consideration for Seller's sale, transfer, conveyance and assignment of the Policy to Purchaser, and that Seller has a complete understanding of the benefits under the Policy. Seller agrees to pay when due all premiums that become due on the Policy until the Closing Date without any adjustment to the Purchase Price and not to permit the Policy to lapse or enter in a grace period.

IV.    Policy in Grace; Payment of Balance of Purchase Price.

A.    The Seller and the Purchaser each acknowledge that the Policy is currently in a grace period and that an amount of not more than $255,008.66 (the "Assessed Premium Amount") has been assessed by the Insurer as the amount that must be paid not later than December 4, 2015 (the "Due Date") in order that the Policy will remain in force from and after the Due Date.

B.    The Seller and the Purchaser each acknowledge and agree that

1.    Not later than December 3 2015, the Seller shall provide to the Purchaser evidence, to the Purchaser's satisfaction, as the amount, if different from the Assessed Premium Amount, required by the Insurer to be paid in order that the Policy will remain in force from and after the Due Date until the next date on which a payment must be made to the Insurer in order to keep the Policy in force (such amount, if different to the Assessed Premium Amount, the "Actual Premium Amount").

2.    The Purchaser shall be entitled to deduct from the Purchase Price the lesser of the Assessed Premium Amount and the Actual Premium Amount whereupon the Purchaser shall be responsible for payment of the Assessed Premium Amount or Actual Premium Amount as applicable.

3.    On the Closing Date, (x) the Purchaser shall pay to the Seller the balance of the Purchase Price after subtracting the lesser of the Assessed Premium Amount and the Actual Premium Amount; and (y) the Purchaser shall pay the Insurer directly an amount equal to the Assessed Premium Amount or the Actual Premium Amount or as applicable.

Seller's Representations and Warranties. As of the Effective Date and the Closing Date, Seller makes the following representations and warranties to Purchaser.

A.    In entering into this Agreement, Seller hereby represents and warrants to

5

Purchaser that:

1.     Seller is duly organized, validly existing and in good standing under the laws of the state of Ohio and has organizational power and authority to own its properties and to conduct its business as such properties are owned and such business is conducted;

2.     Seller is duly qualified to do business in, and is in good standing in, and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business requires such qualifications, licenses or approvals and where the failure to so qualify or to obtain such licenses and approvals could have a material adverse effect on the ability of it to conduct its business or perform its obligations under this Agreement;

3.     there is no fact, circumstance or event that would or could cause any of Seller's licenses or permits that are necessary to perform its obligations under this Agreement to be subject to review, suspension, non-renewal, or that would or could make it ineligible for any such license or permit in the first instance, except for any routine review as provided by statute;

4.     Seller has all necessary corporate and organizational power and authority, as applicable, to execute and deliver this Agreement and to perform its obligations hereunder, including the power and authority to sell, transfer and assign the Policy to Purchaser as contemplated hereby,

5.     Seller exercised full organizational power and authority to purchase the Policy and related property from the Subsequent Seller and duly authorized such purchases;

6.     this Agreement has been duly authorized, executed and delivered by it and constitutes a legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally or by principles of equity;

7.     there is no action, suit or proceeding before or by any court, regulatory body, administrative agency or other Governmental Authority, domestic or foreign, now pending, or to its knowledge, threatened, against or affecting Seller or its assets or properties: (i) asserting the invalidity of this Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement, (iii) seeking any determination or ruling that might materially and adversely affect the performance of its obligations under, or the validity or enforceability of, this Agreement or (iv) individually or in the aggregate for all such actions, suits, proceedings and investigations could reasonably be expected to adversely affect its ability to perform its obligations under this Agreement;

8.     no consent, approval, permit, license, authorization or order of or declaration or filing with any Governmental Authority is required to be obtained by it for the

6

consummation of the transactions contemplated by this Agreement. which consent, approval. authorization. order. declaration or filing would have a material adverse effect on the validity or enforceability of this Agreement. the transfer of the Policy hereunder. or on the ability of Seller to perform its obligations under this Agreement. except such as have been duly made or obtained;

9.     all factual information. reports and other papers and data prepared by or on behalf of the Seller and furnished to the Purchaser by the Seller or its agents were. at the time the same were so furnished or made. when viewed in light of all such other factual information. reports and other papers and date previously so made. complete and correct in all material respects and contain no omissions that would render any of the foregoing misleading in any material respect;

10.     to the Seller's Knowledge. all factual information. reports and other papers and data prepared by third parties and furnished to the Purchaser by the Seller were. at the time the same were so furnished or made. when viewed in light of all such other factual information. reports and other papers and date previously so made. complete and correct in all material respects and contain no omissions that would render any of the foregoing misleading in any material respect;

11.     Seller takes full responsibility for its own tax consequences of its sale. transfer and assignment of each of the Policy in accordance with the terms and conditions of this Agreement;

12.     no provision of the Policy prohibits or restricts Seller from transferring the ownership of such Policy and changing the beneficiary designations of the Policy as contemplated by this Agreement. and the Seller has the full right and authority to do so; and

B.     In entering into this Agreement. with respect to the Policy. Seller represents and warrants that:

1.     to the Seller's Knowledge. with respect to the Policy. the Original Seller fully and effectively purchased and sold all rights. titles. interests and privileges in and to the Policy to the Subsequent Seller;

2.     to the Seller's Knowledge with respect to the Policy. the Subsequent Seller(s) fully and effectively purchased and sold all rights. titles. interests and privileges in and to the Policy to the Seller;

3.     the Seller. through the Seller's Securities Intermediary. is the sole and undisputed owner of the Policy and the named beneficiary of the Policy and has good. valid and marketable title to such Policy;

4.     prior to the transfer of the Policy to the Purchaser. the Seller shall have taken all reasonable actions under Applicable Law in each relevant jurisdiction in order to protect and perfect the ownership of the Seller in such Policy against all creditors of

the Seller other than the Purchase, or creditors or purchasers taking or claiming interests through or as assigns of the Purchaser; upon the sale, transfer and assignment of the Policy to Purchaser by Seller pursuant to this Agreement, the Purchaser shall acquire a good, valid and, through the Securities Intermediary, perfected ownership interest in the Policy and the death benefits payable thereunder;

5.      upon the sale, transfer and assignment of the Policy to Purchaser by Seller pursuant to this Agreement, the Policy will be free and clear of any liens, debts, collateral assignments, charges and other encumbrances;

6.      Seller's purchase of the Policy complied with all applicable federal, state and local laws and regulations, and the resale by Seller to Purchaser pursuant to this Agreement will comply with all applicable federal, state and local laws and regulations;

7.      all required releases and authorizations have been obtained that would permit or authorize Seller and its assigns on behalf of the Purchaser to obtain current medical information regarding the underlying Insured under the Policy to the extent permitted by Applicable Law; provided, however, that Seller makes no representation or warranty as to whether any such documents will be honored by any recipient thereof;

8.      Seller does not have Knowledge of any denial of coverage or any basis for any denial of coverage by the Insurer of any of the Policy, or of any pending or threatened claim or proceeding challenging or contesting the validity or enforceability of the sale by any Original Seller or Subsequent Seller of the Policy to Seller or of the sale, transfer and assignment of the Policy by Seller to Purchaser contemplated by this Agreement;

9.      there are no unpaid Premiums due for the Policy to prevent the policy from going into grace, and the Policy is in full force and effect and will remain in full force and effect through the Closing Date; none of the Seller, any of its Affiliates, the Seller's Securities Intermediary or, to Seller's Knowledge, any other Person, has received a notice of rescission or contest with respect to the Policy from any Person, including without limitation, any Insurer, Insured or prior beneficiary of a Policy;

10.     to the Seller's Knowledge, no provision of the Policy has been amended, waived, altered or modified in any material respect, other than by one of the currently existing riders, an original of which has been delivered to Purchaser and which have been taken into account in determining the Purchase Price;

11.     no Original Seller, Subsequent Seller or prior owner of the Policy has exercised, or notified Seller of its intention to exercise, a right of rescission with respect to such Original Seller's, Subsequent Seller's or prior owner's sale of a Policy;

12.     to the Seller's Knowledge, no action or proceeding has been instituted or is threatened, to restrain, prohibit, declare invalid or seek other relief with respect to the

8

Policy;

13.     to the Seller's Knowledge, Seller has provided all material information, whether verbal or written, relating to the Policy to the Purchaser;

14.     this Agreement and each agreement executed in connection herewith, when duly executed and delivered, will constitute a valid sale, transfer and assignment of the Policy, enforceable by Purchaser against Seller and its successors and assigns;

15.     to the Knowledge of the Seller and its Affiliates, the Policy was solicited, issued and delivered to the Original Owner of the Policy in compliance with all Applicable Law;

16.     to the Knowledge of the Seller and its Affiliates, the Policy qualifies as an life insurance contract under Section 7702 of the Internal Revenue Code of 1986, as amended;

17.     the transactions by which the Seller purchased or otherwise acquired ownership of the Policy were conducted in compliance with all Applicable Laws;

18.     except for the delivery of Acknowledgments by the Insurers, no consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of the Seller or their respective Affiliates in connection with the execution and delivery of this Agreement or the documents to be executed by the Seller pursuant to this Agreement, the compliance by the Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by the Seller of any other action contemplated hereby;

19.     the Policy File contains true, complete and unaltered originals or copies, as applicable, of all the agreements, instruments and other documents referenced in the definition of a Policy File;

20.     the Seller or its authorized agent has had contact with the Insured or an individual designated by such Insured to determine the location of such Insured's primary residence and life status within the six (6) months preceding the Effective Date,

21.     the Seller has at all times been in full compliance with each Applicable Law that governs the privacy of Protected Information, and no event has occurred, and no condition or circumstance exists, that might (with or without notice or lapse of time) constitute, or result directly or indirectly in, a default under, a breach or violation of, or a failure to comply with, by the Seller any such Applicable Law;

22.     no Person has any right to purchase the Policy or any portion thereof, except the Purchaser pursuant to this Agreement;

23.     to the Knowledge of the Seller and its Affiliates, all the data and information

contained in the Policy File in respect of the Policy is true, accurate and complete in all material respects and the Underlying Settlement Agreement Documents are unaltered and complete. With respect to the Policy, the Sale Documentation Package for such Policy includes all instruments, documents and other materials relating to such Policy actually received by the Seller or under its possession or control. The Seller does not possess, nor is it in control of any material documentation or information in any way related to the Policy that has not been delivered or disclosed in writing to the Purchaser. No facts have come to the attention of the Seller which would lead to the belief that such Sale Documentation Package contains any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; and

_Parties' Obligations_. The Parties acknowledge and agree that each Party must fulfill the below obligations pursuant to this Agreement and if any of the below obligations are not met, this Agreement may be terminated at the option of the other Party.

A.   On the Effective Date, Seller shall execute, and shall cause the Seller's Securities Intermediary to execute the Form of Entitlement Order Debit and Transfer of Assets Out of Policy Account attached hereto as Exhibit C ("Seller's Entitlement Order"), which Seller's Entitlement Order shall be held in escrow by the Securities Intermediary as per Section V.E. below.

B.   On the Effective Date, Purchaser shall co-sign the Seller's Entitlement Order attached hereto as Exhibit C, which Seller's Entitlement Order shall be held in escrow by the Securities Intermediary as per Section V.E. below

C.   On the Effective Date, Purchaser shall execute, and shall cause the Purchaser's Securities Intermediary to execute the Form of Entitlement Order Credit and Transfer of Assets Into Policy Account attached hereto as Exhibit D ("Purchaser's Entitlement Order"), which Purchaser's Entitlement Order shall be held in escrow by the Securities Intermediary as per V.E. below (collectively, the Seller's Entitlement Order and the Purchaser's Entitlement Order are referred to herein as the "Entitlement Orders").

D.   Within three (3) Business Days after the Securities Intermediary has confirmed it is in receipt of the Entitlement Orders, Seller shall deliver or cause the Seller's Securities Intermediary to deliver to the Purchaser the Policy File for the Policy.

E.   Upon ~~conformation~~confirmation that the Securities Intermediary has received the Policy File the following shall occur immediately: (x) the Seller shall instruct the Seller's Securities Intermediary to acknowledge the Seller's Entitlement Order and debit the Policy from the Seller's securities ~~intermediary~~ account; (y) the Purchaser and shall instruct the Purchaser's Securities Intermediary to acknowledge the Purchaser's Entitlement Order and credit the Policy to the Purchaser's securities ~~intermediary~~ account; and (z) the Purchase Price shall be released to the Seller; provided, however, that the Closing Date as set forth in Section IX shall not occur, and none of the transactions contemplated in this Agreement, including without limitation, the provisions

set forth in Section X.A. shall be deemed effective, until the Seller has received the Purchase Price in full.

F.    Seller shall provide the Purchaser with any and all requested information and documentation as may be reasonably required by Purchaser to complete Purchaser's due diligence review of the transaction as well as any information and documentation as may be reasonably required by Purchaser to complete the funding and closing of this transaction which may include documents to be signed by Seller and/or Insured.

Purchaser's Representations and Warranties. As of the Effective Date, Purchaser makes the following representations and warranties to Seller:

A.    Purchaser has been duly formed and is in good standing under the laws of the State of Delaware, with power and authority to own its properties and to conduct its business as presently conducted.

B.    Purchaser is duly qualified to do business, in good standing and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business requires such qualifications.

C.    Purchaser has the power and authority to execute, deliver and perform its obligations under this Agreement. The execution, delivery and performance of this Agreement has been duly authorized by Purchaser by all necessary action.

D.    This Agreement has been duly executed and delivered by Purchaser and constitutes a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms, except as such enforceability may be subject to or limited by bankruptcy, insolvency, reorganization, moratorium, liquidation, fraudulent conveyance or other similar laws affecting the enforcement of creditors' rights in general and by general principles or equity or public Policy, regardless of whether such enforceability shall be considered in a proceeding in equity or in law.

E.    The execution or delivery of this Agreement and all related documents, agreements, certifications and releases by the Purchaser, and the performance by the Purchaser of its obligations under this Agreement and all related documents, agreements, certifications and releases, do not and will not (A) violate, conflict with, result in the breach of any terms or provisions of, or constitute an event of default (or event which, with the giving of notice or lapse of time, or both, would become an event of default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, the organizational documents of the Purchaser or any material agreement to which the Purchaser is a party or by which it is bound, or (B) violate any law or regulation to which the Purchaser is subject or any order of any governmental authority having jurisdiction over the Purchaser or any of its assets, properties or businesses, which violation, breach or event of default (other than with respect to any organizational document of the Purchaser) would have a material adverse effect on the validity or enforceability of this Agreement or the ability of the Purchaser to perform its obligations under this Agreement.

F.      There are no proceedings pending or, to the knowledge of the Purchaser, threatened that are against the Purchaser which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of the Purchaser to perform its obligations under this Agreement. The Purchaser is not subject to any order except to the extent the same would not reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement or on the ability of the Purchaser to perform its obligations under this Agreement.

G.      No consent, approval, permit, license, authorization or order of, or declaration or filing with, any Governmental Authority or other Person is required to be made or obtained by the Purchaser in connection with the execution or delivery of this Agreement and all related documents, agreements, certifications and releases by the Purchaser or the performance by the Purchaser of its obligations hereunder and thereunder, except such as have been duly made or obtained of such that are expressly contemplated by this Agreement.

H.      The Purchaser is not in violation of any law or order applicable to it or any of its properties or assets which could materially adversely affect the consummation of the transactions contemplated hereby.

I.      The Purchaser has not filed, nor has anyone, to the Purchaser's knowledge, filed or threatened to file against the Purchaser, any Proceeding seeking to adjudicate the Purchaser insolvent, nor has the Purchaser made any assignment of any property for the benefit of any creditors, nor, to the Purchaser's knowledge, does there presently exist or is threatened any tax or creditor's lien or any other execution, levy, attachment or other process of law upon the property of the Purchaser, nor, to the Purchaser's knowledge, is there any outstanding legal process against the Purchaser or the Purchaser's property which enjoins the Purchaser from consummating the transactions contemplated by this Agreement.

J.      The Purchaser is an "accredited investor" as such term is defined Rule 501(a) under the Securities Act of 1933, as amended (the "Securities Act"). The Purchaser understands that the Policy has not been registered under the Securities Act.

K.      To the Purchaser's knowledge, no Affiliate or Person affiliated with the Purchaser or that makes funds available to the Purchaser or any Affiliate of the Purchaser in order to allow the Purchaser to fulfill its obligations under the Transaction Documents to which the Purchaser is a party or for the purpose of funding any investment in the Purchaser is: (A) a Person listed in the Annex to Executive Order No. 13224 (2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), (B) named on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control, (C) a non-U.S. shell bank or is providing banking services indirectly to a non-U.S. shell bank, (D) a senior non-U.S. political figure or an immediate family member or close associate of such figure, or (E) otherwise

prohibited from investing in the Purchaser pursuant to applicable U.S. anti-money laundering, anti-terrorist and asset control laws, regulations, rules or orders.

L.    The Purchaser alone or with its advisors has such knowledge and experience both in financial, business and tax matters generally, and relating to the acquisition of in-force life insurance policies specifically, to enable it to identify, understand and independently evaluate the merits and risks of the purchase of the Policy, the terms and conditions of this Agreement and the entry into and consummation of the transactions contemplated hereby and thereby.

M.    The Purchaser acknowledges that the Purchaser has had sufficient opportunity to conduct and has conducted to its satisfaction its own independent investigation of the Policy and, in making the determination to proceed with the purchase of the Policy and the transactions contemplated by this Agreement, the Purchaser has relied solely on the results of its independent investigation.

N.    The Purchaser has read and understands this Agreement. The Purchaser has sought and obtained its own legal, tax, accounting, and financial advice with respect to this Agreement and any obligations that the Purchaser will incur or undertake hereunder, and is relying solely upon its own legal, financial, insurance, business, investment, tax, regulatory, accounting, and other advisers in its decision to enter into this Agreement. The Purchaser agrees that it has been afforded to its satisfaction, reasonable opportunity to ask questions concerning the Policy, the acquisition, ownership, and sale of the Policy by the Seller and all terms of this Agreement, and has had all of its questions answered to its satisfaction and has been supplied all information deemed necessary by it in order to make an informed investment decision.

Binding Effect. Except as otherwise provided herein, this Agreement is irrevocably binding upon the Parties and their successors and assigns.

Future Compliance. Seller consents and agrees to sign, execute, acknowledge, deliver, record and/or file any and all future documentation and provide and supply additional information that is reasonably requested by Purchaser and/or the Insurer and/or its successor(s) in regards to the Policy and provide Policy information without right or ability to claim further consideration. Seller shall notify Purchaser immediately of any change in any of Seller's contact information. Seller shall promptly after its receipt thereof forward any information received regarding the Policy directly to Purchaser.

Closing and Payment of Purchase Price to Seller. The closing of the transactions shall occur on the date ("Closing Date") the Entitlement Orders have been acknowledged by the Securities Intermediary, the Policy has been debited from the Seller's securities ~~intermediary~~ account, credited to the Purchaser's ~~Securities intermediary~~ securities account, and the Purchase Price has been received by the Seller, as set forth in Section V.E. herein.

Death of Insured.

A.    If the Insured under the Policy dies on or after the Closing Date for the Policy,

then (a) the Closing Date for the Policy shall be deemed to have occurred on the date of such Insured's death and (b) the Death Benefit for the Policy shall be payable solely to the Purchaser (or its designee) and the Seller covenants and agrees to direct the payment of such Death Benefit to the Purchaser or such Person designated by the Purchaser. If the Seller, or the Seller's Securities Intermediary, receives payment of the Death Benefit of such Policy, the Seller shall, or shall cause the Seller's Securities Intermediary to, hold such proceeds in constructive trust for the sole benefit of the Purchaser, immediately notify the Purchaser of such receipt, and immediately pay over such proceeds to the Purchaser.

B.      If the Insured under a Policy dies prior to the Closing Date for such Policy, so long as the Seller provides written notice thereof to the Purchaser no later than thirty (30) days after such Closing Date, or the date on which the Seller receives notice of such death, whichever occurs first:

      1.      subject to the Seller's payment to the Purchaser of the amounts required in clause 2 below, the Seller shall be entitled to receive the payment of such Death Benefit and this Agreement and the transactions contemplated hereby shall terminate as to such Policy as of the date of such Insured's death; and

      2.      the Seller shall pay to the Purchaser an amount equal to the sum of (a) the Purchase Price ~~paid~~received by the Seller from the Purchaser ~~to the Seller~~ for such Policy, (b) any and all Premium payments actually made by the Purchaser at any time after the Closing Date in respect of such  Policy, (c) all reasonable servicing or verification costs and expenses actually incurred after the Closing Date by the Purchaser in connection with such Policy, which sum may be paid by the set off by the Purchaser against the Death Benefit of such Policy if the Purchaser receives payment of such Death Benefit but only where the Seller has previously received and approved evidence of such sum.

Indemnification.

A.      Notwithstanding anything herein, Seller shall indemnify and hold harmless Purchaser, its Affiliates, and respective, officers, directors, employees, assigns and successors (each, a "Purchaser Indemnified Person") from and against any and all losses, damages, fines, claims, actions, suits, demands, judgments, liabilities of any kind (including penalties), obligations, disbursements of any kind or nature and related costs and expenses (including reasonable attorneys' fees and disbursements) awarded against or incurred by any such person arising out of or as a result of (i) any representation or warranty made by Seller hereunder having been untrue or incorrect in any material respect when made, (ii) any material breach by Seller of any of its covenants, duties and obligations hereunder, (iii) any negligence, bad faith or willful misconduct of Seller in performing its obligations under this Agreement, and/or (iv) any claim, action, or suit brought against Purchaser or any Purchaser Indemnified Person by any Original Owner, other prior owner of a Policy, Insured, prior beneficiary of a Policy or Insurer related, directly or indirectly to any Policy, arising from the circumstances set forth in Section XI.A (i), (ii) and (iii).

B.    Notwithstanding anything herein. Purchaser shall indemnify and hold harmless Seller. and Seller's officers. directors. employees. assigns and successors (each. a "Seller Indemnified Person") from and against any and all losses. damages. fines. claims. actions. suits. demands. judgments. liabilities of any kind (including penalties). obligations. disbursements of any kind or nature and related costs and expenses (including reasonable attorneys' fees and disbursements) awarded against or incurred by any such person arising out of or as a result of (i) any representation or warranty made by Purchaser hereunder having been untrue or incorrect in any material respect when made. (ii) any material breach by Purchaser of any of its covenants. duties and obligations hereunder. or (iii) any negligence. bad faith or willful misconduct of Purchaser in performing its obligations under this Agreement. and/or (iv) any claim. action. or suit brought against Seller or any Seller Indemnified Person by any Original Owner. other prior owner of a Policy, Insured, prior beneficiary of a Policy or Insurer related, directly or indirectly to any Policy arising from the circumstances set forth in Section XI.B (i). (ii) and (iii).

        Confidential Information.

A.        Each Party (the "Receiving Party") agrees not to disclose any Confidential Information (as defined herein) received from the other Party (the "Disclosing Party") to any third party. except as provided in this Section XII.

B.        Confidential Information" means (i) all confidential and non-public information and data pertaining to any Party hereto or that is received. created or obtained in connection with the Policy or this Agreement. in whatever form. whether written. oral. electronic or otherwise furnished by the Disclosing Party to the Receiving Party. (ii) the existence of this Agreement and the terms and conditions hereof. and (iii) documents and information concerning the Policy. the Insureds and their respective family members. prior owner of a Policy and beneficiaries and the transactions and services contemplated hereby. The term "Confidential Information" does not include information that (w) was or becomes generally available to the public other than as a result of a disclosure by the Receiving Party or its officers. directors. employees. advisors or representatives in violation of this Agreement: (x) was or becomes available to the Receiving Party from a source other than the Disclosing Party. provided that such source is not known to the Receiving Party to be bound by a confidentiality agreement with the Disclosing Party or otherwise prohibited from transmitting the information to the Receiving Party: (y) was in the possession of the Receiving Party prior to being furnished to it by or on behalf of the Disclosing Party: or (z) is produced as a result of the Receiving Party's independent development of the information without the use of any of the Protected Information or the Disclosing Party's Confidential Information.

C.    "Consumer" means and includes any Underlying Seller. Insured. prior owner. beneficiary under a Policy. designee of an Insured. and any spouse. significant other. family member or personal contact of any of the foregoing identified in the documentation pertaining to a Policy.

D.    "Protected Information" refers to all non-public. personally identifiable information pertaining to a Consumer. howsoever obtained. which could reasonably be used to identify

that Consumer personally, including, but not limited to, any Consumer's name, street or mailing address, email address, telephone or other contact information, employer, driver's license number, social security or tax identification number, government-issued identification number, photograph or likeness, documentation of identity or residency, medical records, or copies of any life insurance applications or life settlement applications pertaining to such Consumer.

E.    The Receiving Party may disclose Confidential Information if:

    1.    compelled to disclose by judicial, regulatory or administrative process or by other requirements of law;

    2.    disclosed in any action or proceeding brought by a Party in pursuit of its rights or in the exercise of its remedies under this Agreement;

    3.    disclosed to such of its employees, agents and representatives as need to know such Confidential Information for the performance of their duties under this Agreement; provided, however, that such employees, agents and/or representatives shall be acting under an express or implied duty of confidentiality to the Receiving Party at the time of such disclosure; or where the Receiving Party is Purchaser, disclose to the extent necessary to facilitate a sale, financing or securitization of any Policy.

F.    Each Party hereto acknowledges that insurance laws and regulations and other applicable laws and regulations are structured to provide confidentiality to Original Sellers, Insureds and other Consumers in connection with any Protected Information provided in the course of a life insurance or life settlement transaction, and that it is obliged to keep such information confidential under applicable laws and regulations

G.    Each Party shall not disclose to any third party any Protected Information, except:

    1.    as may otherwise be required or permitted by Applicable Law;

    2.    to the extent reasonably necessary to enable such party to perform its obligations under this Agreement;

    3.    in circumstances where the recipient has executed an undertaking to keep such Protected Information confidential, as may be reasonably required for any disclosure of any Protected Information under any Applicable Law; or

    4.    to the extent necessary in order to facilitate a sale, financing or securitization by or on behalf of Purchaser of the Policy.

H.    Notwithstanding anything to the contrary in this Agreement, each Party (and such Party's employees, representatives, or other agents) may disclose to any and all persons, without limitation of any kind, the tax treatment and any facts that may be relevant to the tax structure of the transaction, provided, however, that such Party (and each of such Party's employees, representatives, or other agents) shall not disclose any other

Confidential Information that is not relevant to understanding the tax treatment and tax structure of the transaction (including the identity of any Party to the transaction) and any Confidential Information that could lead another to determine the identity of any Party to the transaction, or any other information to the extent that such disclosure could reasonably result in a violation of any applicable securities law.

Termination.

This Agreement may be terminated, in whole or in part, and the transactions contemplated herein may be abandoned, in whole or in part, at any time after the Effective Date and prior to the Closing Date, as follows:

A.      By either Party upon its delivery to the other Party of a written notice of any material violation or material breach of this Agreement by such other Party and such other Party shall have failed to cure such violation or breach, in the sole determination of the non-breaching Party, within ten (10) days after the date of such notice; or

B.      Notwithstanding anything else in this Agreement, immediately by Purchaser if Purchaser gives Seller notice no later than ten (10) Business Days after the date of this Agreement, in the event that Purchaser's diligence on the Policy, the Insured, or any information related to either causes the Purchaser to conclude, in its sole and absolute discretion, that the Policy is not suitable for purchase by Purchaser.

Severability. If any provision of this Agreement shall be held invalid in a court of law, the remaining provisions shall be construed as if the invalid provision were not included in this Agreement.

Amendments and Final Integration. This Agreement may only be amended or modified through a written duly executed instrument by the Parties hereto. Any attempted oral amendment or modification is ineffective and therefore null and void. This Agreement constitutes and contains the complete and final integrated Agreement between the Parties regarding the subject matter herein. All prior negotiations, discussions and representations are merged into the Agreement. Each Party acknowledges that, except as expressly set forth herein, no representations of any kind or character have been made to it by any other party, or by any Parties' agents, representatives or attorneys, to induce the execution of this Agreement.

Notices. Any and all notices, requests, consents, notifications, and other communications given to any Party to this Agreement shall be given in writing and will be, as elected by the Party giving said notice, hand-delivered by messenger or courier service, telecopied, electronically communicated, or sent via registered or certified mail, return receipt requested, postage prepaid, to the address stated below or to any other address as the Party may later designate by notice complying with the terms of this Section XVI. Each notice is deemed delivered on the date delivered if by personal delivery, on the date of transmission with confirmation if by telex, facsimile, or other telegraphic method and on the date upon which the return receipt is signed or delivery refused or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed.

if to Seller, to:

> Centurion Insurance Services Group, LLC
> ~~15 West 4~~th201 East 5th Street, ~~Suite 31~~319th Floor
> Cincinnati, Ohio 45202
> Attn: Brian J. Schwartz
> Email: bschwartz@centurion-life.com

with a copy to:

> Bank of Utah, as Securities Intermediary
> 200 E. South Temple, Suite 210
> Salt Lake City, UT 84111
> Tel: (801) 924-3672
> Attn: Arge Feotis
> Email: afeotis@bankofutah.com

and, if to Purchaser, to:

> TFG Life Settlements, LLC
> c/o TFG Capital Partners, LLC
> 821 5th Avenue, Suite 202
> Naples, Florida 34102
> Attn: Gary Brecka and Todd Binkowski
> Tel: (239) 304-8990 or (305) 978-1480
> Email: gary.brecka@traditionalgroup.com or TB@theferrantegroup.com

_____ Waiver. Either Party's failure to insist in any one or more instances upon strict performance by the other Party of any of the terms of this Agreement shall not be construed as a waiver of any continuing or subsequent failure to perform or a delay in performance of any term hereof.

_____ Seller May Not Assign. Any assignment, delegation or attempted assignment or delegation by the Seller of its rights, remedies, duties, obligations or responsibilities established under this Agreement shall be null and void without Seller's receipt of the prior written duly executed consent of the Purchaser.

XXI. Purchaser May Not Assign Prior to Closing Date. Any assignment, delegation or attempted assignment or delegation by the Purchaser of its rights, remedies, duties, obligations or responsibilities established under this Agreement prior to the Closing Date shall be null and void without Purchaser's receipt of the prior written duly executed consent of the Seller. For the avoidance of doubt, this provision shall not apply after the Closing Date.

_____ Choice of Law. This Agreement and its enforcement will be governed by, and interpreted in accordance with, the laws of the State of New York applicable to agreements made and to be performed entirely within such state without regard to the conflicts of law provisions

thereof.

XXXXXX.    WAIVER OF JURY TRIAL. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY FOR ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE BREACH, TERMINATION OR VALIDITY THEREOF OR ANY TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (A) NONE OF THE OTHER PARTIES HERETO NOR ITS REPRESENTATIVES, AGENTS OR ATTORNEYS HAVE REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY HERETO UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH PARTY HERETO MAKES THIS WAIVER VOLUNTARILY AND (D) EACH PARTY HERETO HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS OF THIS SECTION XXI. ANY PARTY HERETO MAY CONFIDENTIALLY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

XXXXXX.    Submission to Jurisdiction. Each party to this Agreement hereby submits to the non- exclusive jurisdiction of the United States District Court for the Southern District of New York (the "Court"), for any dispute arising out of or relating to this Agreement or the breach, termination or validity thereof. Each party to this Agreement hereby irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of the venue of any such proceedings brought in such court. Each of the Parties irrevocably and unconditionally waives and agrees not to plead or claim in any such court (a) that it is not personally subject to the jurisdiction of the Court for any reason other than the failure to serve process in accordance with Applicable Law, (b) that it or its property is exempt or immune from jurisdiction of the Court or from any legal process commenced in the Court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (c) to the fullest extent permitted by Applicable Law that (i) the suit, action or proceeding in the Court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper and (iii) this Agreement, or the subject matter hereof, may not be enforced in or by the Court.

XXXXXX.    Expenses. Except as otherwise expressly provided in this Agreement or in the Escrow Agreement, whether or not the transactions contemplated by this Agreement are consummated, all direct and indirect costs and expenses (including any legal and other advisory fees) incurred in connection with this Agreement and the transactions contemplated hereby and thereby shall be borne by the Party hereto incurring such expenses.

XXXXXX.    Specific Performance. The Parties agree that irreparable harm would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms

on a timely basis or were otherwise breached. It is accordingly agreed that, without posting bond or other undertaking, the Parties shall be entitled to injunctive or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity. In the event that any such action is brought in equity to enforce the provisions of this Agreement, no Party will allege, and each Party hereby irrevocably waives the defense or counterclaim, that there is an adequate remedy at law. The Parties further agree that (a) by seeking any remedy provided for in this Section XXIII, a Party shall not in any respect waive its right to seek any other form of relief that may be available to such Party under this Agreement and (b) nothing contained in this Section XXIII shall require either Party to institute any action for (or limit such Party's right to institute any action for) specific performance under this Section XXIII before exercising any other right under this Agreement.

Counterparts and Facsimile. This Agreement may be signed in one or more counterparts, each of which is deemed an original, but all of which together will constitute one and the same instrument. A facsimile copy of this executed Agreement shall be deemed valid as if it were the original.

Headings. The headings and subheadings contained in this Agreement are for convenience of reference only, and are not to be considered part of this Agreement and will not limit or otherwise affect in any way the meaning or interpretation of this Agreement.

Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Enforcement Costs. In the event of any action or suit brought by either Party against the other Party in connection with this Agreement or any of the transactions contemplated hereby, the prevailing Party in such action or suit shall be entitled to recover from the other Party the reasonable expenses, costs and attorneys' fees incurred by such prevailing Party in connection with such action or suit.

Time. Time is of the essence with respect to each Party's performance under this Agreement.

Survival. The representations, warranties, indemnities and covenants of the Parties contained in this Agreement shall survive for ~~five (5) years~~one (1) year after the earlier of (a) the termination of this Agreement in its entirety or (b) the Closing Date.; and, if any claim is to be made for the breach of such a representation or warranty, such claim must be made within thirty this two year period.

Equal Preparation. The Parties acknowledge and agree that each Party has participated equally in the negotiation and preparation of this Agreement and that the rule of law that ambiguities contained in a contract shall be construed against the drafter thereof shall not be

applied to this Agreement or the interpretation or enforcement of any term hereof.

Further Assurances. Each Party agrees to do and perform, from time to time, any and all acts and to execute any and all further instruments required or reasonably requested by the other Party more fully to affect the purposes of this Agreement, that are commercially reasonable to undertake or execute and that do not create for or impose on such party material new obligations, liabilities, costs or expenses.

Binding Effect; Third Party Beneficiaries. This Agreement inures solely to the benefit of and is binding upon the Parties, and no other Person, including, without limitation, any Insured, Insurer, shall have any rights, remedies or obligations under this Agreement.

Publicity. No Party shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval may be withheld in such Party's sole discretion, unless disclosure is otherwise required by Applicable Law; provided, that to the extent required by Applicable Law, the Party intending to make such release shall use its best efforts consistent with such Applicable Law to consult with the other Party with respect to the text thereof.

*Signatures on the following page.*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year set out in the initial paragraph of this Agreement.

**SELLER:**

**CENTURION INSURANCE SERVICES GROUP, LLC**

By: _____
Name:
Title:

**PURCHASER**

**TFG LIFE SETTLEMENTS, LLC**
**By: TFG Capital Partners, LLC, its Managing Member**

By:_____
Name: Domenic Ferrante
Title:

**SECURITIES INTERMEDIARY**

By: Bank of Utah, solely in capacity as Purchaser's Securities Intermediary and Seller's Securities Intermediary, and not in its individual capacity.

By:_____
Name:
Title:

22

~~EXHIBIT A~~

**EXHIBIT A [NTD: this Exhibit is not referenced elsewhere in this Agreement]**

**Authorization for the Release of Life Insurance Policy Information**

Policy Number:            IL02139410
Life Insurance Company:   Aviva Life and Annuity Company
Policy Owner:             Bank of Utah, as Securities Intermediary
Insured:                  Jimmy D. Winemiller

I, the undersigned, hereby authorize and direct the above-referenced life insurance company and/or any other entity or person that has information related to the above-referenced life insurance policy, to release such information to and reply immediately to any written, telephonic or other request for information or documents required by TFG Life Settlements, LLC, and/or their respective employees or other authorized representatives, successors, assignees, designees and/or affiliated entities, pertaining to the above-referenced policy, including, but not limited to the following:

- A fully-completed Verification of Coverage (VOC) form for the above-referenced policy;
- A complete copy of the above-referenced life insurance policy, including the application and all riders, endorsements and supplements thereto;
- Policy Illustrations for the above-referenced policy;
- Change of ownership forms, change of beneficiary forms, collateral assignment forms, absolute assignment forms and any other requested form for the above-referenced policy; and
- Premium and Annual Statement information for the above-referenced policy.

I agree that this Authorization for the Release of Life Insurance Policy Information shall remain valid and in force for the maximum extent allowed by law and that a photocopy or facsimile of this document is as valid as an original.

Bank of Utah, as Securities Intermediary

By:_____
Signature of Policy Owner                    Date
Name:
Title:

**EXHIBIT B [NTD: this Exhibit is not referenced elsewhere in this Agreement]**

**Settlement Distribution Directions**

OPTION 1:  CHECK

Please make check payable to: _____

Please mail check to
Name: _____

Street
Address: _____

City, State,
Zip: _____

Phone: _____

OPTION 2: WIRE TRANSFER

Name on Bank Account: _____

Bank Account Number: _____

Bank Name: _____

Bank Address: _____

Bank ABA/Routing # _____

Bank Phone for Wire/
Contact Person _____

I/We hereby authorize disbursement of the proceeds as indicated above.

Centurion Insurance Services Group, LLC

By: _____
Name:                    Date

Title: _____

24

## EXHIBIT C

### FORM OF ENTITLEMENT ORDER DEBIT AND TRANSFER OF ASSETS OUT OF POLICY ACCOUNT

November [___], 2015

Bank of Utah, as Securities Intermediary
200 E. South Temple, Suite 210
Salt Lake City, UT 84111
Attention: Corporate Trust Services

**Re:** **Transfer of Interests Policies out of Policy Account**

Ladies and Gentlemen:

Reference is hereby made to (a) the Securities Account and Custody Agreement, dated as of [~~~~]July 10, 2012 (the "Securities Account Agreement"), by and between Centurion ~~Insurance Services Group, LLC, a limited liability company organized and existing under the laws of the state of Ohio~~ISG (Europe) Limited, an Irish corporation (the "Seller"), and Bank of Utah, a Utah corporation ("Bank of Utah"), as securities intermediary (in such capacity, the "Securities Intermediary"). All capitalized terms used, but not defined, herein shall have the meanings assigned to them in the Securities Account Agreement. In consideration of the transfers and payments described below, the undersigned parties to this Entitlement Order (the "Entitlement Order") hereby agree as follows:

1.      Reference is hereby made to the Policy Account detailed below, established with the Securities Intermediary pursuant to the Securities Account Agreement:

Bank of Utah
Account #: 8001125
Account Name: Centurion ISG (Europe) Limited

2.      The Seller hereby irrevocably directs the Securities Intermediary, against payment therefor of the amounts (if any) detailed in the attached Schedule II, on the specified date, to effectuate a transfer of the Security Entitlements (as defined in Section 8-102(a)(17) of the UCC) carried in the Custody Account with respect to the Financial Assets relating to the Policies identified on Schedule I attached hereto by debiting the Custody Account and crediting the TFG Life Settlements, LLC (the "Purchaser") Account detailed below (the "Purchaser Account"):

25

Bank of Utah Account #: 8002473
Account Name: TFG Life Settlements Securities Intermediary Account

    3.    The Seller hereby agrees that, upon its receipt of funds from the Purchaser in accordance with the Disbursement Schedule attached hereto as <u>Schedule II</u>, and such concurrent crediting to the account of the Purchaser of the Security Entitlements relating to the indicated Financial Assets relating to the Policies identified on <u>Schedule I</u> attached hereto, all parties to this Entitlement Order have satisfied all obligations with respect to the transfers of Financial Assets hereunder.

    4.    The Purchaser hereby directs the Securities Intermediary to hold the Financial Assets transferred into the Purchaser Account as contemplated in paragraph 2 above in the Purchaser Account until the Purchaser delivers an entitlement order to the Securities Intermediary.

    5.    The Purchaser hereby agrees that, upon its disbursement of funds (if any) in accordance with the Disbursement Schedule attached hereto as <u>Schedule II</u>, and such concurrent crediting to the account of the Purchaser of Security Entitlements relating to the indicated Financial Assets relating to the Policies identified on <u>Schedule I</u> attached hereto, all parties to this Entitlement Order have satisfied all obligations with respect to the transfers of Financial Assets hereunder.

*[Remainder of page intentionally left blank;*
*signature page follows.]*

26

**IN WITNESS WHEREOF**, the undersigned have caused this Entitlement Order to be executed by their duly authorized officers as of the date set forth above.

**SELLER:**

**CENTURION ~~INSURANCE SERVICES GROUP, LLC~~ISG (Europe) Limited**

By:
Name: Brian J. Schwartz
Title: Chairman

**PURCHASER:**

**TFG LIFE SETTLEMENTS, LLC**
**By: TFG Capital Partners, LLC, its Managing Member**

By: _____
       Domenic Ferrante
Its: _____

Acknowledged and Accepted by:

**BANK OF UTAH**,
not in its individual capacity but solely
as Securities Intermediary

By:_____
Name:
Title:

27

**Schedule I**

<u>Financial Assets</u>

| | |
|---|---|
| **Policy Number:** | IL02139410 |
| **Life Insurance Company:** | Aviva Life and Annuity Company (USA) |
| **Policy Face Amount:** | $10,000,000.00 |
| **Policy Issue Date:** | 2/28/2011 |
| **Selling Policy Owner:** | Centurion Insurance Services Group, LLC (Bank of Utah as Securities Intermediary) |
| **Insured:** | Jimmy D. Winemiller |

**Schedule II**

<u>Disbursement Schedule</u>

TFG Life Settlements. LLC confirms that. pursuant to the Life Settlement Purchase and Sale Agreement. Bank of Utah as Securities Intermediary has disbursed the following amounts. in each case on the indicated dates in satisfaction of the Entitlement Order to which this Disbursement Schedule is attached.

Closing Date: November _____. 2015

Amount: $_____

ABA: _____

Account No: _____

Account Name: _____

Further Credit to: _____

29

## EXHIBIT D

## FORM OF ENTITLEMENT ORDER FOR CREDIT AND TRANSFER OF ASSETS INTO POLICY ACCOUNT

November [___], 2015

Bank of Utah, as Securities Intermediary
200 E. South Temple, Suite 210
Salt Lake City, UT 84111
Attention: Corporate Trust Services

Re:    Transfer of Interests in Policies into Policy Account

Ladies and Gentlemen:

Reference is hereby made to (a) the Securities Account and Custody Agreement, dated as of May 14, 2015 (the "Securities Account Agreement"), by and between TFG Life Settlements, LLC, a Delaware limited liability company duly incorporated under the laws of Delaware (the "Purchaser"), and Bank of Utah, a Utah corporation ("Bank of Utah"), as securities intermediary (in such capacity, the "Securities Intermediary"). All capitalized terms used, but not defined, herein shall have the meanings assigned to them in the Securities Account Agreement.

In consideration of the transfers and payments described below, the undersigned parties to this Entitlement Order (the "Entitlement Order") hereby agree as follows:

1.    The Purchaser hereby irrevocably directs the Securities Intermediary to credit the Policy Account detailed below established with the Securities Intermediary pursuant to the Securities Account Agreement with the Policy or Policies, and all proceeds thereof (the "Financial Assets") identified on Schedule I attached hereto:

Bank of Utah
Bank of Utah Account #: 8002473
Account Name: TFG Life Settlements Securities Intermediary Account

2.    The Purchaser hereby directs the Securities Intermediary to hold each Financial Asset credited to the Policy Account as contemplated by paragraph 1 above in Policy Account until the Purchaser delivers an Entitlement Order in respect of such Financial Asset to the Securities Intermediary pursuant to the terms and conditions of the Securities Account Agreement.

3.    The Purchaser hereby agrees that upon the crediting of the Financial Assets to the Policy Account, the Purchaser has acquired a securities entitlement (as defined in Section 8-102(a)(17) of the UCC) with respect to the Financial Assets, the obligations of all parties under this Entitlement Order with respect to the Financial Assets shall have been satisfied, and all

obligations and instructions with respect to the Financial Assets shall thereafter be governed by the terms and conditions of the Securities Account Agreement.

  **IN WITNESS WHEREOF**, the undersigned have caused this Entitlement Order to be executed by their duly authorized officers as of the date set forth above.

      **TFG LIFE SETTLEMENTS, LLC**
      **By: TFG Capital Partners, LLC, its Managing Member**

    By: _____
      Domenic Ferrante
    Its: _____


Acknowledged and Accepted by:

**BANK OF UTAH**,
not in its individual capacity but solely as
Securities Intermediary

By: _____
~~Name:~~
Name: _____
Title:

**Schedule I**

<u>Financial Assets</u>

| | |
|---|---|
| **Policy Number:** | IL02139410 |
| **Life Insurance Company:** | Aviva Life and Annuity Company (USA) |
| **Policy Face Amount:** | $10,000,000.00 |
| **Policy Issue Date:** | 2/28/2011 |
| **Selling Policy Owner:** | Centurion Insurance Services Group, LLC (Bank of Utah as Securities Intermediary) |
| **Insured:** | Jimmy D. Winemiller |

**EXHIBIT E**

**LIMITED RECOURSE LANGUAGE**

It is expressly understood and agreed by the parties hereto that (i) this Life Settlement Purchase and Sale Agreement is executed by Bank of Utah, not in its individual capacity but solely in its capacity as Securities Intermediary under ~~that~~those certain Securities Account and Custody Agreement dated as of May 14, 2015~~, (in such capacity, the "Securities Intermediary")~~ by and between TFG Life Settlements, LLC, a Delaware limited liability company duly incorporated under the laws of Delaware, and Bank of Utah, as Securities Intermediary and Securities Account Control Agreement by and between Centurion ISG (Europe) Limited, an Irish corporation, and Bank of Utah, as Securities Intermediary dated as of July 10, 2012, (ii) in no event shall Bank of Utah, in its individual capacity have any liability for the representations, warranties, covenants, agreements or other obligations of the seller hereunder, as to all of which recourse shall be had solely to the assets of TFG Life Settlements, LLC, (iii) in no event shall the Securities Intermediary have any obligation to perform any of the obligations and covenants of the seller under this Life Settlement Purchase and Sale Agreement, and (iv) under no circumstances shall the Securities Intermediary be personally liable for the payment of any indebtedness or expenses of the seller under this Life Settlement Purchase and Sale Agreement.

**TFG LIFE SETTLEMENTS, LLC**
**By: TFG Capital Partners, LLC, its Managing Member**

By: _____
    Domenic Ferrante
Its: _____


**BANK OF UTAH,**
not in its individual capacity but solely
as Securities Intermediary

_____

By: Name:
~~Name:~~
    Title:

33