UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TFG LIFE SETTLEMENTS, LLC, a
Delaware limited liability company,

      Plaintiff,

vs.                               Case No.:  2:15-cv-00755-SPC-CM

CENTURION INSURANCE SERVICES
GROUP, LLC, and CENTURION ISG
(EUROPE) LIMITED,

      Defendants.

_____/

DEFENDANTS CENTURION INSURANCE SERVICES GROUP, LLC,
AND CENTURION ISG (EUROPE) LIMITED'S RESPONSE IN OPPOSITION
TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND INCORPORATED
MEMORANDUM OF LAW

Defendants, Centurion Insurance Services Group, LLC, and Centurion ISG (Europe) Limited (together, "**Centurion**"), by and through undersigned counsel and pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and Middle District of Florida Local Rule 4.06, make this limited appearance and hereby file this Response in Opposition to the Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (the "**Injunction Motion**") in this matter.[1]

As set forth in greater detail below, the Injunction Motion must be denied, because: (a) Plaintiff has not and cannot establish any reasonable, let alone substantial, likelihood of success on the merits in this matter; (b) Plaintiff cannot, as a matter of law, establish that it

_____

[1] On December 4, 2015, the Court issued a Temporary Restraining Order *ex parte* and scheduled a hearing for December 16, 2015, relating to the continuation of the TRO and issuance of a preliminary injunction. By way of this Response to the Injunction Motion and the Motion to Dissolve the TRO being filed concurrently herewith, Centurion makes a limited appearance (it has yet to be served with process) seeking dissolution of the TRO and denial of the preliminary injunction. To the extent applicable, all arguments and exhibits contained within the Motion to Dissolve the TRO are incorporated as if fully set forth herein and vice versa.
{36749091;1}

will suffer irreparable harm; (c) the declarations filed with the Court and verified allegations in the Complaint in support of the preliminary injunction are incompetent and factually incomplete; (d) Plaintiff did not and cannot demonstrate that the threatened injury outweighs the potential harm to Centurion; and (e) Plaintiff did not and cannot show that the requested injunction would not be adverse to the public interest. Furthermore, if the Court is inclined to issue a preliminary injunction, it must require a bond and set forth findings of fact and conclusions of law as to the amount of the bond.

Centurion notes that if not for its own diligence, the existing TRO (which expires later than the Local Rules allow) and upcoming hearing on Plaintiff's Injunction Motion on December 16, 2015, would be unknown to Centurion, as TFG failed to provide any form of notice of same, and has failed to serve same, despite the Court ordering TFG to do so by virtue of Local Rules 4.05 and 4.06 and Federal Rule of Civil Procedure 65.

## BACKGROUND[2]

Plaintiff, TFG Life Settlements, LLC ("**TFG**"), initiated this case with the filing of a complaint on December 3, 2015 (the "**Complaint**"), wherein it set forth two causes of action against Centurion – breach of contract and breach of oral contract. No count for injunctive relief is found anywhere in the Complaint. Only in its "Wherefore" clause, TFG requests specific performance and injunctive relief as remedies for its breach of contract claim. Despite TFG's attempts to color otherwise, this is a simple breach of contract case, remedied (if necessary and at all) by monetary damages.

The crux of TFG's claims is that it allegedly entered into a contract with Centurion to purchase three (3) certain life insurance policies on the secondary market, *to wit*: (i) an

---

[2] Attached hereto as Exhibit "**1**" and Exhibit "**2**" and incorporated herein are the affidavits of Brian J. Schwartz and Terence Alan Hodge, respectively, in support of this Response opposing the Injunction Motion. Exhibit "**1**" is hereinafter referred to as the "**Schwartz Aff.**" and Exhibit "**2**" is hereinafter referred to as the "**Hodge Aff.**"

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

insurance policy issued by John Hancock Life Insurance Company Policy Number 95475091, insuring the life of Jimmy D. Winemiller with a death benefit of $10,000,000 (the **"Hancock Policy"**); (ii) an insurance policy issued by Aviva Life and Annuity Company Policy Number IL02139410, insuring the life of Jimmy D. Winemiller with a death benefit of $10,000,000 (the **"Aviva Policy"**); and (iii) an insurance policy issued by Zurich American Life Insurance Company Policy Number 151301, insuring the life of Jimmy D. Winemiller with a death benefit in the amount of $5,000,000 (the **"Zurich Policy"**) (collectively, the **"Policies"**); however, Centurion allegedly refuses to sell the Policies to TFG despite TFG allegedly returning signed Purchase and Sale Agreements (the **"PSAs"**) to Centurion.

TFG has mischaracterized the facts, omitted critical information, and misled the Court in pursuit of injunction. While TFG would like the Court to believe a simplification of the underlying facts, its story has gaping holes, which undermine any injunctive relief, and most certainly a temporary restraining order *without* bond. Schwartz Aff., ¶¶4,8.

In November 2015, Centurion and TFG were negotiating a deal whereby TFG would purchase the Policies for a total of $1.8 million. Schwartz Aff., ¶¶9-10. Notably, the deal required the purchase of all three Policies – it was not severable. *Id.* at ¶11. Due to factors affecting this industry, time was of the essence and Centurion required that TFG close the deal before close of business on December 1, 2015. *Id.*; Hodge Aff., ¶6. On November 30, 2015, Centurion sent TFG three signed PSAs, one for each of the Policies, to consummate the sale and make their negotiations an effective and binding agreement. Hodge Aff., ¶5. However, TFG did not unequivocally accept, execute, and return the documents; rather, TFG sat on them, missed their scheduled call to verify the Policies, and

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

in the eleventh hour, began to renegotiate material terms of the PSAs – the purchase price. Hodge Aff., ¶¶6-8.

The disagreement between the parties came about over the required payoff to take the Aviva Policy out of its grace period. In order to avoid the Aviva Policy's lapse on December 4, 2015, the insurance company was demanding payment of a sum not to exceed $255,008.66. Schwartz Aff., ¶14. Centurion disagreed with the insurance carrier over the amount necessary to take the Aviva Policy out of grace. Centurion believed the amount was about $65,000. *Id.* Accordingly, the Aviva PSA included a provision that required $255,008.66 of the purchase price to be held in escrow through December 3, 2015; TFG was to remit the $700,000 purchase price to the Bank of Utah, and the Bank of Utah would hold $255,008.66 of that until December 3, 2015, and disburse accordingly, based on the ultimate payoff amount required by the carrier. *Id.* However, *after Centurion sent the signed contracts*, TFG told Centurion it wanted to *instead* just assume the payoff amount was $255,008.66 and deduct that from the purchase price. *Id.* This was a material change to the agreement, and not something Centurion was willing to accept. *Id.* at ¶¶14-15,18.

Though TFG has characterized to the Court their renegotiation attempt as a simple recitation of a provision already in the contract, this demanded "small condition" (as TFG called it) affected an essential term of the agreement between the parties, which embroiled them in further negotiation and disagreement. Schwartz Aff., ¶¶14-15; Hodge Aff., ¶¶7-12. In an effort to obtain expedited injunctive relief, TFG has grossly misled the Court about its industry and about its particular dealings with Centurion.

Significantly, TFG also failed to inform the Court that within about an hour or so of its correspondence regarding the Aviva Policy grace issue (again, *after Centurion provided TFG with its signed contracts for the sale of the Policies*), it also informed Centurion that it

- 4 -

believed the Hancock Policy was in grace as well and would be requiring a $52,000 deduction from the purchase price of the Hancock Policy. Schwartz Aff., ¶17. This was yet again an eleventh hour, last ditch effort to reduce the $1.8 million purchase price for the Policies and alter an essential term of the agreement. By the time TFG decided to just sign and send back the PSAs, Centurion's offer was already off the table for a host of reasons: (1) it was rejected; (2) it was revoked; and (3) it was expired.  Schwartz Aff., ¶¶8,12-20.

## MEMORANDUM OF LAW

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003) (citation and quotation omitted); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (internal quotation omitted) (a preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."). The burden is on the *Plaintiff* as the movant to demonstrate that a preliminary injunction should be granted. *See, e.g., Abbott Labs v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1334 (Fed. Cir. 2006).

Rule 65 of the Federal Rules of Civil Procedure and Local Rules 4.05 and 4.06 govern the manner by which preliminary injunctions and temporary restraining orders are obtained in federal court.  Concerning requests for preliminary injunctions in general, the Eleventh Circuit has held as follows:

> The grant or denial of a motion for preliminary injunction is a decision within the discretion of the trial court.... That discretion is guided by four requirements for preliminary injunctive relief: (1) a substantial likelihood that the movants will ultimately prevail on the merits; (2) that they will suffer irreparable injury if the injunction is not issued; (3) that the threatened injury to the movants outweighs the

- 5 -

> potential harm to the opposing party; and (4) that the
> injunction, if issued, would not be adverse to the public
> interest.

*Haitian Refugee Center, Inc. v. Nelson*, 872 F. 2d 1555, 1561 (11th Cir. 1989). *See also*

*Winter v. Natural Resources Defense Council*, 129 S. Ct. 365, 374 (2008). Notably, an

application for a temporary restraining order must meet essentially the same elements, and

additionally "must be supported by allegations . . . that such [irreparable] injury is so

imminent that notice and hearing on the application for preliminary injunction is

impractical if not impossible." *Chase Manhattan Bank v. Dime Savings Bank of New York*,

961 F. Supp. 275, 276 (M.D. Fla. 1997).

Plaintiff does not demonstrate that such extraordinary relief is necessary or

justified. In the present case, neither the verified Complaint nor the declarations submitted

by Gary Brecka (the **"Brecka Dec."**) and James Maxson (the **"Maxson Dec."**) sufficiently

support the request for the preliminary injunction (let alone the TRO). As evidenced by

the exhibits already before the Court, as well as the opposing Schwartz Aff. and Hodge

Aff. and exhibits thereto, TFG is hard-pressed to demonstrate a substantial likelihood of

success on the merits. Further, TFG's basis for the irreparable harm prong of this analysis

is unsupported by law or fact. Additionally, TFG fails to demonstrate the harm to

Centurion is outweighed by the harm to TFG, especially considering TFG can be made

whole, if necessary, by virtue of monetary damages. Lastly, TFG fails to show the

injunction would not be adverse to public policy.

Moreover, Local Rule 4.06 mandates that "[a] preliminary injunction may **not** be

issued absent notice . . . which must be given at least fourteen (14) days in advance of the

hearing." (Emphasis added.) For this reason alone, the preliminary injunction should be

denied, as the hearing was scheduled with insufficient notice to Centurion. Nor,

- 6 -

incidentally, has TFG served Centurion with process of any of the Court papers, as Federal Rule 65 and Local Rule 4.06 require. Schwartz Aff., ¶¶5-6,21. Indeed, it is only by the exercise of Centurion's due diligence that it is even aware of the TRO, the hearing on the Injunction Motion, and all attendant deadlines. *Id.* On December 3, 2015, TFG e-mailed (perhaps as a courtesy or perhaps as a legal threat) to Centurion's in-house counsel the unfiled complaint and motion for injunction. The very next day, Centurion retained counsel, and the TRO was on the docket. Five days have passed since the TRO was entered and TFG has yet to provide Centurion any form of subsequent notice of the TRO or of the hearing on December 16, 2015, and has yet to serve Centurion with process. *Id.*

## I. Plaintiff Cannot Clearly Demonstrate Likelihood Of Success On The Merits.

Underpinning the entirety of the dispute at issue is the negotiation of the PSAs for the purchase of the Policies. TFG would like the Court to believe it accepted an offer to purchase the Policies and that this dispute is a clear-cut breach of contract case. However, in reality, TFG tried to unilaterally accept an offer that was no longer extended. TFG cannot show a likelihood of success on the merits, despite the pretty picture it has painted for the Court because it has not demonstrated that it entered into valid and binding contracts with respect to the purchase of the Policies. Following is the accurate timeline of events and salient facts:

(1) Centurion and TFG were initially negotiating a deal through a broker whereby TFG would purchase the Policies from Centurion by Thanksgiving 2015. That deadline came and went, and on November 30, 2015, with only a day to spare before the required closing date, Centurion delivered directly to TFG's counsel Centurion's signed signature pages for the PSAs.

(2) Section IV.A. of the Aviva PSA signed by Centurion states: "The Seller and Purchaser each acknowledge that the Policy is currently in

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

grace period and that an amount of not more than $255,008.66 (the 'Assessed Premium Amount') has been assessed by the Insurer as the amount that must be paid not later than December 4, 2015 (the 'Due Date') in order that the Policy will remain in force from and after the Due Date." Section IV.B.1. states: "The Seller and the Purchaser each acknowledge and agree that [n]ot later than December 3, 2015, the Seller shall provide to the Purchaser evidence, to the Purchaser's satisfaction, as to the amount, if different from the Assessed Premium Amount, required by the Insurer to be paid in order that the Policy will remain in force from and after the Due Date until the next date on which a payment must be made to the Insurer in order to keep the Policy in force (such amount, if different to the Assessed Premium Amount, the 'Actual Premium Amount')."

(3) Under Section IV.B.2., the lesser of the Assessed Premium Amount or Actual Premium Amount would be deducted from the Purchase Price for the Aviva Policy. Centurion added the language in Section IV.B.2. because it believed that less than $255,008.66 was required to take the Aviva Policy out of grace.

(4) The parties were all aware the PSAs had to close by close of business December 1, 2015.

(5) In an email from Gary Brecka of TFG to Brian Schwartz of Centurion on December 1, 2015 at 4:24 pm, Brecka wrote: "After we spoke with the AVIVA carrier, I am now convinced that the full $255,000 premium is actually due. It is a combination of two things. 1. The minimum amount needed to take the policy out of grace and restore the policy to in force status [i.e., the amount described as the "Actual Premium Amount" in Section IV.B.1. of the Aviva policy PSA] AND 2. The amount needed to restore the account values to the minimum required values. That amount is $177,724.31.

If this is not paid, TFG will have to make this payment to restore the underpaid portion of the 5 year minimum (as this has been underfunded) and the minimum cash account values.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

If you are OK to allow this premium to be paid by Bank of Utah as part of the closing, I will agree to close immediately."

(6) Schwartz responded via email at 5:08 pm the same day, stating: "Gary, Please call me as soon as possible.

And please note, until we speak and come to agreement on this premium issue, Centurion is not trading any of these policies.

Please note that the signed PSAs that you are holding are held in escrow and not to be released without our authority." Brecka responded by email 7 minutes later, stating: "Brian, I fully agree and do not, will not, expect us to close until we are in agreement. Lets [sic] talk and get the final details ironed out."

(7) At some point around the time of this email exchange, TFG informed Centurion that it believed the Hancock Policy to also be out of grace and wanted a similar reduction in purchase price to the tune of $52,000. Centurion again disagreed.

(8) At 6:02 pm on December 1st, Alan Hodge (Centurion's counsel), who had been copied on the previous communications, sent an email to Jim Maxson (TFG's counsel), also copied previously, stating: "In light of events late this afternoon, I am confirming that, as previously advised, the PSAs executed by Brian Schwartz and delivered to you yesterday with respect to the Jimmy D Winemiller policies issued by John Hancock, Aviva and Zurich respectively are to remain in escrow not to be released until we give formal notice to that effect.

To that end, assuming that our respective principals are able to reach an agreement regarding the Aviva premium issue, we would have a closing call during which you and we would respectively release each executed PSA to the other. . . . "

(9) At 8:54 pm on December 1st, Maxson sent an email to Hodge, stating, among other things, that "we do not agree that Centurion's PSA signature pages are being held in escrow pending further instruction," and attaching TFG's signed signature pages for the three PSAs. Maxson's

- 9 -

email does not address the premium issue that Brecka agreed to "get the final details ironed out." Moreover, it was sent well after close of business.

(10) Hodge sent a response email to Maxson (copying Brecka and Schwartz) on December 2, 2015, at 2:45 pm, disagreeing with Maxson's position and stating that there were no contracts between the parties and, "upon further consideration, Centurion is withdrawing from any further discussions regarding these three policies."

*See* Schwartz Aff. and Hodge Aff. and exhibits thereto.

What is made abundantly clear from the correspondence and dealings between the parties is the utter lack of indicia of contract – there is absolutely no meeting of the minds between the parties at the point when Hodge received Maxson's email. Indeed, Florida and New York both interpret the scenario as one creating absolutely no contractual obligation.[3]

For example, in *Farago v. Burke*, 262 N.Y. 229 (1933), the High Court of New York held that a seller of real property was allowed to change his mind, and "[tear] up the contract," where the seller had given the buyer his signature page to hold in escrow for the contract of sale but the buyer did not sign, instead having requested a few days to review the contract with his attorney. Until the buyer had signed, the seller was free to change his mind and revoke the deal.

Under New York law, "if either party communicates an intent not to be bound until he receives a fully executed document, no amount of negotiation or oral agreement to specific terms will result in formation of a binding contract. Because of this freedom to determine the exact point at which an agreement becomes binding, a party can negotiate candidly, secure in the knowledge that he will not be bound until execution of what both parties consider to be a final document." *Winston v. Medifare Entertainment Corp.*, 777

---

[3] Centurion maintains that the parties never entered into the PSAs and thus no terms therein are enforceable. In the abundance of caution, however, both Florida and New York law are cited herein; nevertheless, Florida and New York law are aligned in any event.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

F.2d 78, 80 (2d Cir. 1986) (citation omitted) (emphasis added).  One of the factors that courts in New York consider when deciding whether the parties are bound before a written contract is executed where one is contemplated is whether there was anything left to negotiate.  *See Chariot Group, Inc. v. American Acquisition Partners, L.P.*, 751 F. Supp. 1144, 1150 (S.D.N.Y. 1990), aff'd, 932 F.2d 956 (2d Cir. 1991) (citation omitted). Here there were most certainly details left to negotiate, as evidenced by the correspondence between Brecka and Schwartz, specifically wherein Brecka acknowledged the dispute, agreed to hold Centurion's signature pages in escrow, and suggested that the parties "talk and get the final details ironed out."  Moreover, Brecka expressly agreed not to "close until we are in agreement."  The premium issue had not been "ironed out" and resolved when Maxson sent TFG's signature pages late December 1.

Indeed, Brecka's imposition of his "small condition" relating to the Aviva Policy was in actuality a counteroffer to Centurion's offer to sell the Policies. Under both Florida and New York law, a counteroffer acts as a rejection of the original offer. *See Racing Props., L.P. v. L.T. Baldwin, III*, 885 So. 2d 881, 883 (Fla. 3d DCA 2004) (request for additional collateral constituted a counteroffer and rejection of initial offer, notwithstanding that the request was withdrawn upon objection); *Polk v. BHRGU Avon Props., LLC*, 946 So. 2d 1120, 1123-25 (Fla. 2d DCA 2006) (specific performance reversed where purchaser had countered seller's offer and thus rejected same); *Jericho Gr., Ltd. v. Midtown Dev., L.P.*, 32 A.D.3d 294, 299 (N.Y.S. 2006) (dismissing counts for breach of contract where defendant's offers to extend study period were met by counteroffers for different extensions, and thus the original extension offers were "null and void" by the time the plaintiff decided to accept); *Thor Props., LLC v. Willspring Holdings, LLC*, 118 A.D.3d 505, 507 (N.Y.S. 2014) (finding complaint for breach of

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

contract seeking to compel specific performance properly dismissed where plaintiff had modified a material term, thus rejecting the offer from defendant and proposing a new offer that the defendant never accepted). If a party fails to unequivocally accept the offeror's terms, but rather "responds by conditioning acceptance on new or modified terms, that response constitutes both a rejection and a counteroffer which extinguishes the initial offer." *Thor Props., LLC*, 118 A.D.3d at 507; *Racing Props., L.P.*, 885 So. 2d at 883. "Rejection by counteroffer extinguishes the offer and renders any subsequent acceptance thereof inoperable." *Jericho Gr.*, 32 A.D. at 299.

Brecka's "small condition" – as illustrated in the email exchange itself, though grossly mischaracterized by TFG in its Injunction Motion – changed a material term of the agreement, the price.   TFG attempts to portray the conversation between Brecka and Schwartz as Brecka confirming the language of the provision. However, that was not the case.  First of all, the provision allowed Centurion two days post-closing to work out with the carrier the exact amount owed to take the Aviva Policy *out of grace and restore it in force*.  In the meantime, the parties agreed that amount would not exceed $255,008.66, and therefore, the Aviva PSA provided that the Bank of Utah would hold $255,008.66 in escrow and then make the required payment to keep the policy *out of grace and restore it in force* to the insurance carrier by the deadline and disburse any remainder to Centurion. What Brecka was suggesting was taking the entire $255,008.66 outright for the insurance carrier, providing Centurion no opportunity to recoup any remainder.  He accounted for that *in his email* stating that he believed approximately $77,000 was required to take the Aviva Policy out of grace and restore it in force, but that the remaining roughly $178,000 was needed to restore the Aviva Policy's account value.  This was not at all contemplated in the Aviva PSA and constituted a new condition, or a rejection and counteroffer, to the

- 12 -

PSAs Centurion signed. Thus, at that moment, Centurion's offer was no longer outstanding and effective, and could not be rightly accepted by TFG.

Further, TFG thereafter did essentially the same thing with respect to the Hancock Policy. The Hancock PSA contained no provision regarding any required holdback amount to take it out of grace and restore it in force, yet TFG subsequently attempted to condition the Hancock PSA on a $52,000 holdback on account of the Hancock Policy. The parties did not agree with respect to the Hancock Policy that it even was out of grace. Again, TFG's actions constituted a rejection and counteroffer, which neither Maxson nor anyone else at TFG can overcome to resurrect Centurion's initial offer.

Additionally, to the extent TFG tries to assert it had already entered into a binding agreement with Centurion for the purchase of the Policies, which simply had to be memorialized in writing, that position is neither supported in law or fact. First, it is undermined by TFG's own words that the written document would supersede all prior agreements. Second, any prior oral agreement constituted no more than an agreement to agree, which does not equate to an enforceable contract. *See White Const. Co., Inc. v. Martin Marietta Materials*, Inc., 633 F. Supp. 2d 1302, 1320-1 (M.D. Fla. 2009) (letter of intent not binding because it was "clear that the Parties contemplated future negotiations leading to a formal written contract."); *Bankers Trust v. Basciano,* 960 So. 2d 773 (Fla. 5th DCA 2007) (dismissing tort and contract claims because an agreement to agree is not actionable under Florida law).

It is clear that at the point in which TFG signed the PSAs, there was no offer it could validly accept. When TFG began negotiating the provision regarding the grace payoff – a material provision that directly affected the purchase price for the deal – it rejected Centurion's offer, extinguishing all rights to later accept it. Moreover, even if

- 13 -

Brecka's "small condition" did not act as a rejection of the offer (it did), prior to TFG's purported acceptance by transmittal of the signed documents, Centurion clearly revoked the offer as evidenced by the e-mail exchange between Brecka and Schwartz. Additionally, the parties were all aware that time was of the essence and that if the contract did not close by December 1, 2015, the offer would expire. Accordingly, at most, the signature pages amounted to a new offer, which Centurion validly declined. As established herein, TFG is hard-pressed to show its likelihood of success on the merits, and accordingly, the preliminary injunction should not be issued.

Because each and every element must be proven to secure injunctive relief, if any element is not proven, there is no need to even address the others. *Sofarelli v. Pinellas County*, 931 F.2d 718, 724 (11th Cir. 1991). However, following are additional reasons why the preliminary injunction should not issue.

## II. TFG Cannot Demonstrate Irreparable Harm.

Neither the verified Complaint, Brecka Dec. nor Maxson Dec. make any factual assertions to support the representations made concerning any purported irreparable harm. Instead, TFG states in conclusory fashion that the Policies are unique and relies on a provision in the PSAs to assert that money damages would be an inadequate remedy under the circumstances, and therefore an injunction is required to halt Centurion's attempts to sell the Policies elsewhere. However, TFG does not support a showing of irreparable harm for several reasons.

First, this is a breach of contract case, and if TFG is ultimately found to have been damaged by Centurion's actions, there is an adequate remedy at law to make TFG whole. Where, as here, damages can be calculated, no irreparable harm can be found to exist in support of injunctive relief. *See Minnesota Mining and Mfg. Co., v. Alphapharm Pty. Ltd.,*

- 14 -

No. Civ. 99-13, 2002 WL 1299996, at * 4 (D. Minn. Mar. 8, 2002). TFG argues that the PSAs include provisions that explicitly state the parties' agreement that irreparable harm exists and there is no adequate remedy at law if the PSAs are breached. This argument fails for two reasons. First, despite TFG's attempts to classify otherwise, the PSAs were never even entered into, and therefore the provisions therein are not binding on Centurion.

Second, even if the PSA language is binding, circuit and district courts, including those sitting in Florida and New York, have rejected the notion that a contract clause, by itself, provides sufficient evidence to support preliminary injunctive relief. *See, e.g, Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) (declining to presume irreparable harm based on a contract clause); *Smith, Bucklin & Assocs., Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996) (finding that contractual concession of irreparable harm is an "insufficient prop"); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004); *Anago Franchising, Inc. v. CHMI, Inc.*, No. 09-60713-CIV, 2009 WL 5176548, *11 (S.D. Fla. Dec. 21, 2009) ("Such a contract provision, however, 'is not alone dispositive of the issue of irreparable harm, and does not insulate a plaintiff seeking a preliminary injunction from the need to prove that it will suffer imminent irreparable injury as a result of the [defendant's] conduct.'") (citing *Boston Laser, Inc. v. Qinxin Zu*, No. 3:07–CV–0791, 2007 WL 2973663, at *12 (N.D.N.Y. Sept. 21, 2007)); *AXMS Corp. v. Friedman*, 948 F. Supp. 2d 319, 337-38 (S.D.N.Y. 2013); *Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001); *Riverside Publishing Co. v. Mercer Publishing LLC*, No. C11-1249RAJ, 2011 WL 3420421 (W.D. Wash. Aug. 4, 2011), *8 ("the court queries whether it can give any weight to such a clause"). *Cf. Winter*, 129 S. Ct. 365 (requiring more than a mere possibility of irreparable harm to issue injunction).

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

Without more, TFG fails to show inadequacy of a remedy at law and therefore fails to establish irreparable harm, as required for issuance of a preliminary injunction.

**III.    TFG Cannot Show That Any Threatened Injury Outweighs The Harm To Centurion.**

Indeed, as already mentioned, this is a breach of contract case, that can clearly be remedied with monetary damages.  If damages can be calculated, no irreparable harm can be found to exist in support of injunctive relief. *See Minnesota Mining and Mfg. Co.*, 2002 WL 1299996, at * 4.  If a preliminary injunction restricting Centurion from selling the Policies is not issued, and Plaintiff ultimately prevails in this lawsuit, then Plaintiff can recover monetary damages from Centurion.  It can easily provide evidence comparing the $1.8 million price of the Policies to the costs associated with maintaining the Policies and the value of the Policies on the tertiary market to determine the damages attendant to the alleged breach of contract. On the other hand, Centurion has already been harmed by the TRO and will continue to be harmed by a preliminary injunction, by virtue of the fact that it cannot profit from any sale of the restricted Policies at this time, it must continue paying the extremely high premiums to maintain those Policies in full force (money it would not need to spend if it could sell the Policies), and, in fact, the very existence of the TRO has caused already one buyer to back out of a separate $400,000 deal. An outstanding injunction against Centurion is bad for business far beyond the Policies at issue.  A preliminary injunction can really hurt Centurion, whereas it provides no particular benefit to TFG, and should therefore not be issued. *See United States v. Lambert*, 695 F. 2d 536 (11th Cir. 1983) (affirming denial of preliminary injunction). In *Lambert*, the Eleventh Circuit stated that "[h]arm alone is insufficient" and "the propriety of a preliminary

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

injunction turns on the balance of harm." *Id.* at 540. Here, as in *Lambert*, the balance of the harms weighs in favor of Centurion and against the movant.

## IV.   TFG Fails to Demonstrate that the Injunction, if Issued, Would Not Be Adverse to the Public Interest.

TFG grasps at straws in its effort to demonstrate the public interest factor. The truth is that the public interest would be greatly disserved by issuance of this preliminary injunction. If every potential purchaser of goods, products and commodities was able to enjoin the seller from dispensing with such goods, products and commodities during the pendency of a lawsuit, it would chill commerce. If every breach of contract claim came attendant with an injunction, it would halt the economy. Specifically, within the particular industry in which this case is couched, such injunctive relief is unheard of.

## V.   If The Court Is Inclined To Issue A Preliminary Injunction, A Bond Must Be Required.

Under Rule 65(c) of the Federal Rules of Civil Procedure, a court may "only" issue a preliminary injunction "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *Piambino v. Bailey*, 757 F. 2d 1112 (11th Cir. 1985) ("before a court may issue a preliminary injunction, a bond must be posted") (citing *Atomic Oil Co. of Oklahoma v. Bardahl Oil Co.*, 419 F.2d 1097 (10th Cir. 1969), *cert. denied*, 397 U.S. 1063, 90 S.Ct. 1500, 25 L.Ed.2d 685 (1970)). Accordingly, the Court must require that TFG post a bond in an amount adequate to protect Centurion from damages incurred as a result of the restrictions imposed by the injunction in the event it is later decided that the injunction was wrongfully entered. *Id.*; *see also North American Products Corp. v. Moore*, 196 F. Supp. 2d 1217, 1232 (M.D. Fla. 2002) (applying mandate

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

of Rule 65(c) to require surety bond to protect party enjoined from costs and damages in case that party was wrongfully enjoined).

Moreover, findings of fact and an explanation regarding the Court's bond setting are required to be included in an injunction order. *See, e.g., De Souza v. JPMorgan Chase Home Lending Div.*, 608 Fed. Appx. 776 (11th Cir. Apr. 24, 2015); *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149 (10th Cir. 2001); *Gateway E. Ry. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134 (7th Cir. 1994); *Starsurgical, Inc. v. Aperta, LLC*, 832 F. Supp. 2d 1000 (E.D. Wis. 2011) (the district court cannot simply set an injunction bond at whatever amount it thinks appropriate; instead, reasons must support the number chosen so that the reviewing court can determine whether the number was within a range of options from which one could expect a reasonable trial judge to select).

In the instant case, if this Court issues the preliminary injunction sought by Plaintiff, this Court should require it to post a security bond in the amount of *at least* $1,000,000 pursuant to Rule 65(c). *See, e.g., North American Products Corp.*, 196 F. Supp. 2d at 1232 (setting $500,000 bond because "[p]ursuant to Rule 65(c) and Fla. Stat. § 542.335(1)(j) no preliminary injunction should issue without the giving of security by the applicant sufficient for payment of costs and damages as may be incurred or suffered by any party to have been wrongfully enjoined."); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, n.3 (3d Cir. 2002) (noting district court reset $1,000,000 security bond for injunction to $9,180,000.00).    Frankly, a $1,000,000 bond may not even be sufficient to cover the costs and damages attendant to a preliminary injunction, but it is based on Plaintiff's own allegations and thus cannot be argued an unreasonable minimum suggested bond amount.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

**WHEREFORE**, Centurion respectfully requests that the Court deny the Plaintiff's

request for preliminary injunctive relief and award such other relief as is just and proper.

Respectfully submitted,

**AKERMAN LLP**
Las Olas Centre II
350 East Las Olas Boulevard
Suite 1600
Fort Lauderdale, Florida 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224


By: /s/ Jonathan S. Robbins
    Jonathan S. Robbins
    Florida Bar No. 989428
    E-mail: jonathan.robbins@akerman.com
    Tamara S. Malvin
    Florida Bar No. 00727586
    E-mail: tamara.malvin@akerman.com
    *Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 9, 2015, I filed the foregoing document

with the Clerk of the Court. I also certify that the foregoing document is being served this

day on all counsel of record or pro se parties identified on the below Service List in the

manner specified, either via transmission of Notices of Electronic Filing generated by

CM/ECF or in some other authorized manner for those counsel or parties who are not

authorized to received electronic Notices of Filing.

/s/ Jonathan S. Robbins
Jonathan S. Robbins

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

**SERVICE LIST**
**Case No.:   2:15-cv-00755-SPC-CM**

| Aaron M. McKown<br>Ring Bender McKown & Castillo, LLLP<br>2 Park Plaza, Suite 550<br>Irvine, CA 92614<br>949/202-5810<br>Fax: 786/703-1481<br>Email: amckown@ringbenderlaw.com<br>***Attorneys for Plaintiff*** | Jonathan S. Robbins<br>AKERMAN LLP<br>Las Olas Centre II<br>350 East Las Olas Boulevard, Suite 1600<br>Fort Lauderdale, Florida 33301<br>Telephone: (954) 463-2700<br>Facsimile: (954) 463-2224<br>Email:  jonathan.robbins@akerman.com<br>***Attorneys for Defendants*** |
|---|---|
| Carlos B. Castillo<br>Ring Bender McKown & Castillo LLLP<br>One Alhambra Plaza Ste 620<br>Coral Gables, FL 33134<br>786/235-2030<br>Fax: 786/235-2030<br>Email: ccastillo@ringbenderlaw.com<br>***Attorneys for Plaintiff*** | Tamara S. Malvin<br>AKERMAN LLP<br>Las Olas Centre II<br>350 East Las Olas Boulevard, Suite 1600<br>Fort Lauderdale, Florida 33301<br>Telephone: (954) 463-2700<br>Facsimile: (954) 463-2224<br>Email:  tamara.malvin@akerman.com<br>***Attorneys for Defendants*** |