# Exhibit 2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TFG LIFE SETTLEMENTS, LLC,
a Delaware limited liability company,

    Plaintiff,

vs.

                                Case No.  2:15-cv-755-FtM-38CM

CENTURION INSURANCE SERVICES
GROUP, LLC, an Ohio limited liability
company, and CENTURION ISG (EUROPE)
LIMITED, an Irish corporation,

    Defendants.

_____/

## SUPPLEMENTAL DECLARATION OF GARY BRECKA IN SUPPORT OF TFG'S OPPOSITION TO DEFENDANTS' EMERGENCY MOTION AND IN RESPONSE TO OPPOSITION TO TFG'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, Gary Brecka declares as follows:

1. My name is Gary Brecka. I am over 18 years of age, and I am capable of making this declaration. I have personal knowledge of the facts stated in this declaration and attest that they are true and correct.

2. As I previously testified, insurance policies, like real estate, are unique assets. No two policies are the same. The owner of a life insurance policy, life real estate, obtains a bundle of rights with its ownership. It can elect to maintain the policy through maturity, it can attempt to sell the policy, it can securitize it, or it can transfer it for other non-monetary consideration. Absent the moment when a insured matures, the actual monetary value of the policy is not determinable. It is for this very reason why sophisticated persons within the life settlement industry routinely confirm in their purchase agreements the irreparable harm that will be suffered in the event of breach and why those parties expressly consent to the issuance of an injunction without bond in the event of a party's breach, just as the parties did with each of the three agreements at issue here.

3. During the course of our negotiations with Centurion, I became aware that the Aviva Policy was in grace and that the carrier had demanded a payment of $255,008.66 on or before December 4, 2015 to bring the policy out of grace. In purchasing the Aviva Policy, it was important that the policy was taken out of grace because the carrier does not allow for the ownership of the policy to change while the policy is in grace.

4. As a result, the parties amended the purchase agreement for the Aviva Policy to provide a mechanism for payment of the outstanding premium owed to the carrier for the purpose of bringing the policy out of grace prior to closing. The procedure agreed to by the parties is set out in Section V of the Aviva Policy purchase agreement and provides that the actual amount needed to bring the policy out of grace, if different than the amount claimed by the carrier, would be paid prior to closing.

5. I was agnostic regarding the actual amount of the premium that was owed to the carrier, whether that was $1 or $255,008.66, because the amount of the premium had no impact on the price that TFG was paying to purchase the Aviva Policy. My concern was with the ability to change ownership of the Aviva Policy with the carrier, which no carrier will allow if a policy is in grace. As a result, it was always material to TFG that the Aviva Policy be taken out of grace as part of the closing, which is why the written purchase agreement provides for that to occur as part of the purchase process.

6. Centurion executed the purchase agreement for the Aviva Policy on November 30, 2015. The next day, at 4:10 p.m., I received an email from Brian Schwartz of Centurion requesting that the parties modify their agreement by allowing the Aviva Policy to close before resolving with the carrier the amount of the premium needed to take the policy out of grace and without payment of that premium. A true and correct copy of Mr. Schwartz's proposal is attached hereto as **Exhibit A**. Given the urgency with which Mr. Schwartz wanted to close the sale of the Aviva Policy, I responded to Mr. Schwartz at 4:24 p.m. stating that I was willing to accommodate his request provided that the premium in the amount of $255,008.66 was paid to the carrier in order to take the Aviva Policy out of grace as provided in the contract. As I explained in my email, I had just spent several hours on the phone with the carrier and was convinced that the total amount of $255,088.06 was owed to bring the Aviva Policy out of grace.

7. Contrary to Centurion's contention, my email did not add a new condition nor was I rejecting the parties' agreement for the Aviva Policy. Rather, I was responding to Mr.

Schwartz's request to modify the parties' agreement by following the procedure already agreed to – paying the premium as part of the closing. It was never my intention to deviate from the originally agreed upon terms nor was I intending to inject new terms into the deal. Rather, I was trying to accommodate Mr. Schwartz's desire to close as quickly as possible while still ensuring that the outstanding premium on the Aviva Policy was paid as part of the purchase as agreed to by the parties.

8. The parties were unable to reach an agreement on the modification proposed by Mr. Schwartz as reflected in his email to me at 5:08 p.m. on December 1, 2015.

9. The communications between myself and Mr. Schwartz related only to the purchase agreement for the Aviva Policy as that was the only policy that was subject to this premium issue at the time.

10. I have read the declaration of Brian Schwartz in opposition to TFG's motion for preliminary injunction. Contrary to Mr. Schwartz statement, at no time did him and I ever discuss, orally or otherwise, a hard deadline to close on any of the policies nor would I have agreed to such a hard deadline without first being assured that the premium owed on the Aviva Policy to take it out of grace was determined with the carrier and paid. Indeed, we exchanged numerous emails between November 30, 2015 and December 1, 2015 and not a single one ever referenced an agreement to close by December 1, 2015. This simply was not a term of our agreement. Had it been, it would have been set forth in the parties' written agreements, which it was not.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 10th day of December, 2015.

_____
GARY BRECKA

**EXHIBIT A**

# Aaron McKown

**Subject:** FW: Funds Confirmation

---

**From:** Brian Schwartz <bschwartz@centurion-life.com>
**Date:** Tuesday, December 1, 2015 at 4:10 PM
**To:** Gary Brecka <gary.brecka@naplescapitalpartners.com>
**Subject:** RE: Funds Confirmation

Gary;

Can we focus on closing at Bank of Utah today… with regard to the Aviva policy, the US$255,008.66 will be held in escrow, so we can figure this out tomorrow as well.

This is very important. Please call me, so we can finalize and coordinate for today's closing.

Best Regards,

BJS

**From:** Gary Brecka [mailto:gary.brecka@naplescapitalpartners.com]
**Sent:** Tuesday, December 01, 2015 3:51 PM
**To:** Brian Schwartz
**Subject:** Re: Funds Confirmation

Love these guys

**From:** Brian Schwartz <bschwartz@centurion-life.com>
**Date:** Tuesday, December 1, 2015 at 3:54 PM
**To:** Arge Feotis <afeotis@BankofUtah.com>, Gary Brecka <gary.brecka@naplescapitalpartners.com>
**Cc:** Alan Hodge <AHodge@Centurion-life.com>
**Subject:** RE: Funds Confirmation

Arge;

Thank you very much.

Best Regards,

BJS

**From:** Arge Feotis [mailto:afeotis@BankofUtah.com]
**Sent:** Tuesday, December 01, 2015 3:50 PM
**To:** Brian Schwartz; Gary Brecka
**Cc:** Alan Hodge
**Subject:** RE: Funds Confirmation

Brian,
I will be available and will coordinate with Josh if needed.

1

We are gathering the credit / debit orders as we speak.

Regards,

Gary

# Exhibit C